## COOLIDGE *v.* NEW HAMPSHIRE

No. 323. Argued January 12, 1971—Decided June 21, 1971

444

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J. (as to Part III), and HARLAN (as to Parts I, II-D, and III), DOUGLAS, BRENNAN, and MARSHALL, JJ., joined. HARLAN, J., filed a concurring opinion, *post,* p. 490. BURGER, C. J., filed a concurring and dissenting opinion, *post,* p. 492. BLACK, J., filed a concurring

and dissenting opinion, in a portion of Part I and in Parts II and III of which BURGER, C. J., and BLACKMUN, J., joined, *post*, p. 493. WHITE, J., filed a concurring and dissenting opinion, in which BURGER, C. J., joined, *post*, p. 510.

*Archibald Cox,* by appointment of the Court, 400 U. S. 814, argued the cause for petitioner. With him on the briefs were *Matthias J. Reynolds, John A. Graf,* and *Robert L. Chiesa.*

*Alexander J. Kalinski* argued the cause for respondent. With him on the brief was *Warren B. Rudman,* Attorney General of New Hampshire.

MR. JUSTICE STEWART delivered the opinion of the Court.*

We are called upon in this case to decide issues under the Fourth and Fourteenth Amendments arising in the context of a state criminal trial for the commission of a particularly brutal murder. As in every case, our single duty is to determine the issues presented in accord with the Constitution and the law.

Pamela Mason, a 14-year-old girl, left her home in Manchester, New Hampshire, on the evening of January 13, 1964, during a heavy snowstorm, apparently in response to a man's telephone call for a babysitter. Eight days later, after a thaw, her body was found by the side of a major north-south highway several miles away. She had been murdered. The event created great alarm in the area, and the police immediately began a massive investigation.

On January 28, having learned from a neighbor that the petitioner, Edward Coolidge, had been away from home on the evening of the girl's disappearance, the police went to his house to question him. They asked

---

*Parts II-A, II-B, and II-C of this opinion are joined only by MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL.

him, among other things, if he owned any guns, and he produced three, two shotguns and a rifle. They also asked whether he would take a lie-detector test concerning his account of his activities on the night of the disappearance. He agreed to do so on the following Sunday, his day off. The police later described his attitude on the occasion of this visit as fully "cooperative." His wife was in the house throughout the interview.

On the following Sunday, a policeman called Coolidge early in the morning and asked him to come down to the police station for the trip to Concord, New Hampshire, where the lie-detector test was to be administered. That evening, two plainclothes policemen arrived at the Coolidge house, where Mrs. Coolidge was waiting with her mother-in-law for her husband's return. These two policemen were not the two who had visited the house earlier in the week, and they apparently did not know that Coolidge had displayed three guns for inspection during the earlier visit. The plainclothesmen told Mrs. Coolidge that her husband was in "serious trouble" and probably would not be home that night. They asked Coolidge's mother to leave, and proceeded to question Mrs. Coolidge. During the course of the interview they obtained from her four guns belonging to Coolidge, and some clothes that Mrs. Coolidge thought her husband might have been wearing on the evening of Pamela Mason's disappearance.

Coolidge was held in jail on an unrelated charge that night, but he was released the next day.[1] During the ensuing two and a half weeks, the State accumulated a quantity of evidence to support the theory that it was he who had killed Pamela Mason. On February 19, the results of the investigation were presented at a meeting between the police officers working on the case and the

---

[1] During the lie-detector test, Coolidge had confessed to a theft of money from his employer. See III-A of text, *infra*.

State Attorney General, who had personally taken charge of all police activities relating to the murder, and was later to serve as chief prosecutor at the trial. At this meeting, it was decided that there was enough evidence to justify the arrest of Coolidge on the murder charge and a search of his house and two cars. At the conclusion of the meeting, the Manchester police chief made formal application, under oath, for the arrest and search warrants. The complaint supporting the warrant for a search of Coolidge's Pontiac automobile, the only warrant that concerns us here, stated that the affiant "has probable cause to suspect and believe, and does suspect and believe, and herewith offers satisfactory evidence, that there are certain objects and things used in the Commission of said offense, now kept, and concealed in or upon a certain vehicle, to wit: 1951 Pontiac two-door sedan . . . ." The warrants were then signed and issued by the Attorney General himself, acting as a justice of the peace. Under New Hampshire law in force at that time, all justices of the peace were authorized to issue search warrants. N. H. Rev. Stat. Ann. § 595:1 (repealed 1969).

The police arrested Coolidge in his house on the day the warrant issued. Mrs. Coolidge asked whether she might remain in the house with her small child, but was told that she must stay elsewhere, apparently in part because the police believed that she would be harassed by reporters if she were accessible to them. When she asked whether she might take her car, she was told that both cars had been "impounded," and that the police would provide transportation for her. Some time later, the police called a towing company, and about two and a half hours after Coolidge had been taken into custody the cars were towed to the police station. It appears that at the time of the arrest the cars were parked in the Coolidge driveway, and that although dark had fallen

they were plainly visible both from the street and from inside the house where Coolidge was actually arrested. The 1951 Pontiac was searched and vacuumed on February 21, two days after it was seized, again a year later, in January 1965, and a third time in April 1965.

At Coolidge's subsequent jury trial on the charge of murder, vacuum sweepings, including particles of gun powder, taken from the Pontiac were introduced in evidence against him, as part of an attempt by the State to show by microscopic analysis that it was highly probable that Pamela Mason had been in Coolidge's car.[2] Also introduced in evidence was one of the guns taken by the police on their Sunday evening visit to the Coolidge house—a .22-caliber Mossberg rifle, which the prosecution claimed was the murder weapon. Conflicting ballistics testimony was offered on the question whether the bullets found in Pamela Mason's body had been fired from this rifle. Finally, the prosecution introduced vacuum sweepings of the clothes taken from the Coolidge house that same Sunday evening, and attempted to show through microscopic analysis that there was a high probability that the clothes had been in contact with Pamela Mason's body. Pretrial motions to suppress all this evidence were referred by the trial judge to the New Hampshire Supreme Court, which ruled the evidence admissible. 106 N. H. 186, 208 A. 2d 322. The jury found Coolidge guilty and he was sentenced to life imprisonment. The New Hampshire Supreme Court affirmed the judgment of conviction, 109 N. H. 403, 260 A. 2d 547, and we granted certiorari to consider the constitutional questions raised by the admission of this evidence against Coolidge at his trial. 399 U. S. 926.

---

[2] For a very strong argument that this evidence should have been excluded because altogether lacking in probative value, see Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329, 1342 n. 40 (1971).

## I

The petitioner's first claim is that the warrant authorizing the seizure and subsequent search of his 1951 Pontiac automobile was invalid because not issued by a "neutral and detached magistrate." Since we agree with the petitioner that the warrant was invalid for this reason, we need not consider his further argument that the allegations under oath supporting the issuance of the warrant were so conclusory as to violate relevant constitutional standards. Cf. *Giordenello* v. *United States,* 357 U. S. 480; *Aguilar* v. *Texas,* 378 U. S. 108.

The classic statement of the policy underlying the warrant requirement of the Fourth Amendment is that of Mr. Justice Jackson, writing for the Court in *Johnson* v. *United States,* 333 U. S. 10, 13–14:

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

Cf. *United States* v. *Lefkowitz,* 285 U. S. 452, 464; *Giordenello* v. *United States, supra,* at 486. *Wong Sun* v.

*United States*, 371 U. S. 471, 481–482; *Katz* v. *United States*, 389 U. S. 347, 356–357.

In this case, the determination of probable cause was made by the chief "government enforcement agent" of the State—the Attorney General—who was actively in charge of the investigation and later was to be chief prosecutor at the trial. To be sure, the determination was formalized here by a writing bearing the title "Search Warrant," whereas in *Johnson* there was no piece of paper involved, but the State has not attempted to uphold the warrant on any such artificial basis. Rather, the State argues that the Attorney General, who was unquestionably authorized as a justice of the peace to issue warrants under then-existing state law, did in fact act as a "neutral and detached magistrate." Further, the State claims that *any* magistrate, confronted with the showing of probable cause made by the Manchester chief of police, would have issued the warrant in question. To the first proposition it is enough to answer that there could hardly be a more appropriate setting than this for a *per se* rule of disqualification rather than a case-by-case evaluation of all the circumstances. Without disrespect to the state law enforcement agent here involved, the whole point of the basic rule so well expressed by Mr. Justice Jackson is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations—the "competitive enterprise" that must rightly engage their single-minded attention.[3] Cf. *Mancusi* v. *DeForte*, 392 U. S. 364, 371. As for the proposition that the existence of probable cause renders noncompliance with the warrant procedure an irrelevance,

---

[3] After hearing the Attorney General's testimony on the issuance of the warrants, the trial judge said:

"I found that an impartial Magistrate would have done the same as you did. I don't think, in all sincerity, that I would expect that you could wear two pairs of shoes."

it is enough to cite *Agnello* v. *United States*, 269 U. S. 20, 33, decided in 1925:

> "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."

See also *Jones* v. *United States*, 357 U. S. 493, 497–498; *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, 392. ("[T]he rights . . . against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way.")

But the New Hampshire Supreme Court, in upholding the conviction, relied upon the theory that even if the warrant procedure here in issue would clearly violate the standards imposed on the Federal Government by the Fourth Amendment, it is not forbidden the States under the Fourteenth. This position was premised on a passage from the opinion of this Court in *Ker* v. *California*, 374 U. S. 23, 31:

> "Preliminary to our examination of the search and seizures involved here, it might be helpful for us to indicate what was not decided in *Mapp* [v. *Ohio*, 367 U. S. 643]. First, it must be recognized that the 'principles governing the admissibility of evidence in federal criminal trials have not been restricted . . . to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts . . . this Court has . . . formulated rules of evidence to be applied in federal criminal prosecutions.' *McNabb* v. *United States*, 318 U. S. 332, 341 . . . *Mapp*, however, established no assumption by this Court of supervisory authority over state courts . . . and, consequently, it implied no total

> obliteration of state laws relating to arrests and searches in favor of federal law. *Mapp* sounded no death knell for our federalism; rather, it echoed the sentiment of *Elkins* v. *United States, supra,* at 221, that 'a healthy federalism depends upon the avoidance of needless conflict between state and federal courts' by itself urging that '[f]ederal-state cooperation in the solution of crime under constitutional standards will be promoted, if only by recognition of their now mutual obligation to respect *the same fundamental criteria* in their approaches.' 367 U. S., at 658." (Emphasis in *Ker.*)

It is urged that the New Hampshire statutes which at the time of the searches here involved permitted a law enforcement officer himself to issue a warrant was one of those "workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States," *id.,* at 34, authorized by *Ker.*

That such a procedure was indeed workable from the point of view of the police is evident from testimony at the trial in this case:

> "The Court: You mean that another police officer issues these [search warrants]?
>
> "The Witness: Yes. Captain Couture and Captain Shea and Captain Loveren are J. P.'s.
>
> "The Court: Well, let me ask you, Chief, your answer is to the effect that you never go out of the department for the Justice of the Peace?
>
> "The Witness: It hasn't been our—policy to go out of the department.
>
> "Q. Right. Your policy and experience, is to have a fellow police officer take the warrant in the capacity of Justice of the Peace?
>
> "A. That has been our practice."

But it is too plain for extensive discussion that this now abandoned New Hampshire method of issuing "search warrants" violated a fundamental premise of both the Fourth and Fourteenth Amendments—a premise fully developed and articulated long before this Court's decisions in *Ker* v. *California, supra,* and *Mapp* v. *Ohio,* 367 U. S. 643. As Mr. Justice Frankfurter put it in *Wolf* v. *Colorado,* 338 U. S. 25, 27–28:

> "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned . . . ."

We find no escape from the conclusion that the seizure and search of the Pontiac automobile cannot constitutionally rest upon the warrant issued by the state official who was the chief investigator and prosecutor in this case. Since he was not the neutral and detached magistrate required by the Constitution, the search stands on no firmer ground than if there had been no warrant at all. If the seizure and search are to be justified, they must, therefore, be justified on some other theory.

II

The State proposes three distinct theories to bring the facts of this case within one or another of the exceptions to the warrant requirement. In considering them, we must not lose sight of the Fourth Amendment's fundamental guarantee. Mr. Justice Bradley's admonition in his opinion for the Court almost a century ago in *Boyd*

v. *United States,* 116 U. S. 616, 635, is worth repeating here:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." [4]

Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se*

---

[4] See also *Gouled* v. *United States,* 255 U. S. 298, 303–304 (1921):

"It would not be possible to add to the emphasis with which the framers of our Constitution and this court . . . have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments [the Fourth and Fifth]. The effect of the decisions cited is: that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen,—the right, to trial by jury, to the writ of *habeas corpus* and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers."

See also *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 357.

unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." [5] The exceptions are "jealously and carefully drawn," [6] and there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." [7] "[T]he burden is on those seeking the exemption to show the need for it." [8] In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or "extravagant" to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England,[9] and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important.[10]

## A

The State's first theory is that the seizure on February 19 and subsequent search of Coolidge's Pontiac were "incident" to a valid arrest. We assume that the arrest of Coolidge inside his house was valid, so that the first condition of a warrantless "search incident" is met. *Whiteley* v. *Warden,* 401 U. S. 560, 567 n. 11. And since the events in issue took place in 1964, we assess the State's argu-

---

[5] *Katz* v. *United States,* 389 U. S. 347, 357.

[6] *Jones* v. *United States,* 357 U. S. 493, 499.

[7] *McDonald* v. *United States,* 335 U. S. 451, 456.

[8] *United States* v. *Jeffers,* 342 U. S. 48, 51.

[9] See *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (1765), and *Wilkes* v. *Wood,* 19 How. St. Tr. 1153, 98 Eng. Rep. 489 (1763).

[10] See *Elkins* v. *United States,* 364 U. S. 206.

ment in terms of the law as it existed before *Chimel* v. *California*, 395 U. S. 752, which substantially restricted the "search incident" exception to the warrant requirement, but did so only prospectively. *Williams* v. *United States*, 401 U. S. 646. But even under pre-*Chimel* law, the State's position is untenable.

The leading case in the area before *Chimel* was *United States* v. *Rabinowitz*, 339 U. S. 56, which was taken to stand "for the proposition, *inter alia*, that a warrantless search 'incident to a lawful arrest' may generally extend to the area that is considered to be in the 'possession' or under the 'control' of the person arrested." *Chimel, supra,* at 760. In this case, Coolidge was arrested inside his house; his car was outside in the driveway. The car was not touched until Coolidge had been removed from the scene. It was then seized and taken to the station, but it was not actually searched until two days later.

First, it is doubtful whether the police could have carried out a contemporaneous search of the car under *Rabinowitz* standards. For this Court has repeatedly held that, even under *Rabinowitz*, "[a] search may be incident to an arrest ' "only if it is substantially contemporaneous with the arrest and is confined to the *immediate* vicinity of the arrest. . . ." ' " *Vale* v. *Louisiana*, 399 U. S. 30, 33, quoting from *Shipley* v. *California*, 395 U. S. 818, 819, quoting from *Stoner* v. *California*, 376 U. S. 483, 486. (Emphasis in *Shipley*.) Cf. *Agnello* v. *United States*, 269 U. S., at 30–31; *James* v. *Louisiana*, 382 U. S. 36. These cases make it clear beyond any question that a lawful pre-*Chimel* arrest of a suspect outside his house could never by itself justify a warrantless search inside the house. There is nothing in search-incident doctrine (as opposed to the special rules for automobiles and evidence in "plain view," to be considered below) that suggests

a different result where the arrest is made inside the house and the search outside and at some distance away.[11]

Even assuming, *arguendo,* that the police might have searched the Pontiac in the driveway when they arrested Coolidge in the house, *Preston* v. *United States,* 376 U. S. 364, makes plain that they could not legally seize the car, remove it, and search it at their leisure without a warrant. In circumstances virtually identical to those here, MR. JUSTICE BLACK's opinion for a unanimous Court held that "[o]nce an accused is under arrest and in custody, then a search [of his car] made at another place, without a warrant, is simply not incident to the arrest." *Id.,* at 367. *Dyke* v. *Taylor Implement Mfg. Co.,* 391 U. S. 216. Cf. *Chambers* v. *Maroney,* 399 U. S. 42, 47. Search-incident doctrine, in short, has no applicability to this case.[12]

---

[11] The suggestion in Part III-A of the concurring and dissenting opinion of MR. JUSTICE BLACK that this represents the formulation of "a *per se* rule reaching far beyond" *Chimel* v. *California,* 395 U. S. 752, *post,* at 503, is mistaken. The question discussed here is whether under pre-*Chimel* law the police could, contemporaneously with the arrest of Coolidge inside his house, make a search of his car for evidence—i. e., the particles later introduced at his trial. There can be no question that after *Chimel,* such a search could not be justified as "incident" to the arrest, since *Chimel* held that a search so justified can extend only to the "arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 395 U. S., at 763. The quite distinct question whether the police were entitled to seize the automobile as evidence in plain view is discussed in Part II-C below. Cf. n. 24, *infra.*

[12] *Cooper* v. *California,* 386 U. S. 58, is not in point, since there the State did not rely on the theory of a search incident to arrest, but sought to justify the search on other grounds. *Id.,* at 60. MR. JUSTICE BLACK's opinion for the Court in *Cooper* reaffirmed *Preston* v. *United States,* 376 U. S. 364.

## B

The second theory put forward by the State to justify a warrantless seizure and search of the Pontiac car is that under *Carroll* v. *United States*, 267 U. S. 132, the police may make a warrantless search of an automobile whenever they have probable cause to do so, and, under our decision last Term in *Chambers* v. *Maroney*, 399 U. S. 42, whenever the police may make a legal contemporaneous search under *Carroll*, they may also seize the car, take it to the police station, and search it there. But even granting that the police had probable cause to search the car, the application of the *Carroll* case to these facts would extend it far beyond its original rationale.

*Carroll* did indeed hold that "contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant," [13] provided that "the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported." [14] Such searches had been explicitly authorized by Congress, and, as we have pointed out elsewhere,[15] in the conditions of the time "[a]n automobile . . . was an almost indispensable instrumentality in large-scale violation of the National Prohibition Act, and the car itself therefore was treated somewhat as an offender and became contraband." In two later cases,[16] each involving an occupied automobile stopped on the open highway and searched for contra-

---

[13] 267 U. S., at 153.

[14] *Id.*, at 156.

[15] *United States* v. *Di Re*, 332 U. S. 581, 586.

[16] *Husty* v. *United States*, 282 U. S. 694; *Brinegar* v. *United States*, 338 U. S. 160.

band liquor, the Court followed and reaffirmed *Carroll*.[17] And last Term in *Chambers, supra,* we did so again.

The underlying rationale of *Carroll* and of all the cases that have followed it is that there is

> "a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or auto-

---

[17] A third case that has sometimes been cited as an application of *Carroll* v. *United States*, 267 U. S. 132, is *Seher* v. *United States*, 305 U. S. 251. There, the police were following an automobile that they had probable cause to believe contained a large quantity of contraband liquor. The facts were as follows:

The driver "turned into a garage a few feet back of his residence and within the curtilage. One of the pursuing officers left their car and followed. As petitioner was getting out of his car this officer approached, announced his official character, and stated he was informed that the car was hauling bootleg liquor. Petitioner replied, 'just a little for a party.' Asked whether the liquor was tax paid, he replied that it was Canadian whiskey; also, he said it was in the trunk at the rear of the car. The officer opened the trunk and found . . . ." 305 U. S., at 253.

The Court held:

"Considering the doctrine of *Carroll* v. *United States*, 267 U. S. 132 . . . and the application of this to the facts there disclosed, it seems plain enough that just before he entered the garage the following officers properly could have stopped petitioner's car, made search and put him under arrest. So much was not seriously controverted at the argument.

"Passage of the car into the open garage closely followed by the observing officer did not destroy this right. No search was made of the garage. Examination of the automobile accompanied an arrest, without objection and upon admission of probable guilt. The officers did nothing either unreasonable or oppressive. *Agnello* v. *United States*, 269 U. S. 20, 30; *Wisniewski* v. *United States*, 47 F. 2d 825, 826 [CA6 1931]." 305 U. S., at 254–255.

Both *Agnello,* at the page cited, and *Wisniewski* dealt with the admissibility of evidence seized during a *search incident to a lawful arrest.*

> mobile, for contraband goods, where *it is not practicable. to secure a warrant* because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U. S., at .153. (Emphasis supplied.)

As we said in *Chambers, supra,* at 51, "exigent circumstances" justify the warrantless search of "an automobile *stopped on the highway*," where there is probable cause, because the car is "movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." "[T]he opportunity to search is fleeting . . . ." (Emphasis supplied.)

In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly "fleeting." The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous.

When the police arrived at the Coolidge house to arrest him, two officers were sent to guard the back door while the main party approached from the front. Coolidge was arrested inside the house, without resistance of any kind on his part, after he had voluntarily admitted the officers at both front and back doors. There was no way in which he could conceivably have gained access to the automobile after the police arrived on his property. When Coolidge had been taken away, the police informed Mrs. Coolidge, the only other adult occupant of the

house, that she and her baby had to spend the night elsewhere and that she could not use either of the Coolidge cars. Two police officers then drove her in a police car to the house of a relative in another town, and they stayed with her there until around midnight, long after the police had had the Pontiac towed to the station house. The Coolidge premises were guarded throughout the night by two policemen.[18]

The word "automobile" is not a talisman in whose presence the Fourth Amendment fades away and dis-

[18] It is frequently said that occupied automobiles stopped on the open highway may be searched without a warrant because they are "mobile," or "movable." No other basis appears for MR. JUSTICE WHITE's suggestion in his dissenting opinion that we should "treat searches of automobiles as we do the arrest of a person." *Post,* at 527. In this case, it is, of course, true that even though Coolidge was in jail, his wife was miles away in the company of two plainclothesmen, and the Coolidge property was under the guard of two other officers, the automobile was in a literal sense "mobile." A person who had the keys and could slip by the guard could drive it away. We attach no constitutional significance to this sort of mobility.

First, a good number of the containers that the police might discover on a person's property and want to search are equally movable, *e. g.,* trunks, suitcases, boxes, briefcases, and bags. How are such objects to be distinguished from an unoccupied automobile—not then being used for any illegal purpose—sitting on the owner's property? It is true that the automobile has wheels and its own locomotive power. But given the virtually universal availability of automobiles in our society there is little difference between driving the container itself away and driving it away in a vehicle brought to the scene for that purpose. Of course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it, the police may make a search of appropriately limited scope. *Chimel* v. *California,* 395 U. S. 752. See II-A of the text, *supra.* But if *Carroll* v. *United States,* 267 U. S. 132, permits a warrantless search of an unoccupied vehicle, on private property and beyond the scope of a valid search incident to an arrest, then it would permit as well a warrantless search of a suitcase or a box. We have found no case that suggests such an extension of *Carroll.* See nn. 16, 17, *supra.*

appears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll* v. *United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where "it is not practicable to secure a warrant," *Carroll, supra,* at 153, and the "automobile exception," despite its label, is simply irrelevant.[19]

---

[19] Cf. *United States* v. *Payne,* 429 F. 2d 169 (CA9 1970). In that case, two couples were camping in an individually allotted campsite in Yosemite National Park. During the evening, an off-duty policeman camping with his family in an adjoining site observed the two couples smoking a substance he believed to be marihuana and also observed them making what he thought "furtive" movements to remove objects he thought to be drugs from the glove compartment of a car parked nearby. He summoned a park ranger, and the two entered the campsite. They found that one of the couples was preparing to bed down for the night, while the couple to whom the car belonged were visiting in another campsite. The officers searched the unoccupied parked automobile, found 12 Seconal capsules, and arrested the couple who had stayed behind. The Government attempted to uphold the search under *Carroll, supra,* and *Brinegar, supra.* The Court of Appeals answered:

"While it is true that the Supreme Court has enunciated slightly different rules concerning a search of an automobile without a warrant, the rationale is apparently based upon the fact that a 'vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' Chimel v. California, 395 U. S. 752, 764 . . . . In the instant case the search of the Volkswagen cannot be justified upon this reasoning. There is no indication in the record that the appellant or any of his party were preparing to leave, and quite to the contrary it is clear that appellant was bedding down for the evening and that there was ample time to secure the necessary warrant for the search of the car had [the Park Ranger] believed there was probable cause to seek one." 429 F. 2d, at 171–172.

Since *Carroll* would not have justified a warrantless search of the Pontiac at the time Coolidge was arrested, the later search at the station house was plainly illegal, at least so far as the automobile exception is concerned. *Chambers, supra,* is of no help to the State, since that case held only that, where the police may stop and search an automobile under *Carroll,* they may also seize it and search it later at the police station.[20]   Rather, this case is controlled by *Dyke* v. *Taylor Implement Mfg. Co., supra.* There the police lacked probable cause to seize or search the defendant's automobile at the time of his

[20] Part III-B of the concurring and dissenting opinion of MR. JUSTICE BLACK argues with vehemence that this case must somehow be controlled by *Chambers* v. *Maroney,* 399 U. S. 42, yet the precise applicability of *Chambers* is never made clear.   On its face, *Chambers* purports to deal *only* with situations in which the police may legitimately make a warrantless search under *Carroll* v. *United States,* 267 U. S. 132.   Since the *Carroll* rule does not apply in the circumstances of this case, the police could not have searched the car without a warrant when they arrested Coolidge.   Thus MR. JUSTICE BLACK's argument must be that *Chambers* somehow operated *sub silentio* to extend the basic doctrine of *Carroll.*   It is true that the actual search of the automobile in *Chambers* was made at the police station many hours after the car had been stopped on the highway, when the car was no longer movable, any "exigent circumstances" had passed, and, for all the record shows, there was a magistrate easily available. Nonetheless, the analogy to this case is misleading.   The rationale of *Chambers* is that *given* a justified initial intrusion, there is little difference between a search on the open highway and a later search at the station.   Here, we deal with the prior question of *whether* the initial intrusion is justified.   For this purpose, it seems abundantly clear that there is a significant constitutional difference between stopping, seizing, and searching a car on the open highway, and entering private property to seize and search an unoccupied, parked vehicle not then being used for any illegal purpose.   That the police may have been legally on the property in order to arrest Coolidge is, of course, immaterial, since, as shown in II-A of the text, *supra,* that purpose could not authorize search of the car even under *United States* v. *Rabinowitz,* 339 U. S. 56.

arrest, and this was enough by itself to condemn the subsequent search at the station house. Here there was probable cause, but no exigent circumstances justified the police in proceeding without a warrant. As in *Dyke*, the later search at the station house was therefore illegal.[21]

## C

The State's third theory in support of the warrantless seizure and search of the Pontiac car is that the car itself was an "instrumentality of the crime," and as such might be seized by the police on Coolidge's property because it was in plain view. Supposing the seizure to be thus lawful, the case of *Cooper* v. *California,* 386 U. S. 58, is said to support a subsequent warrantless search at the station house, with or without probable cause. Of course, the distinction between an "instrumentality of crime" and "mere evidence" was done away with by *Warden* v. *Hayden,* 387 U. S. 294, and we may assume that the police had probable cause to seize the automobile.[22] But, for the reasons that follow, we hold that the "plain view" exception to the warrant requirement is inapplicable to this case. Since the seizure was therefore

---

[21] *Cooper* v. *California,* 386 U. S. 58, is no more in point here than in the context of a search incident to a lawful arrest. See n. 12, *supra.* In *Cooper,* the seizure of the petitioner's car was mandated by California statute, and its legality was not questioned. The case stands for the proposition that, given an unquestionably legal seizure, there are special circumstances that may validate a subsequent warrantless search. Cf. *Chambers, supra.* The case certainly should not be read as holding that the police can do without a warrant at the police station what they are forbidden to do without a warrant at the place of seizure.

[22] Coolidge had admitted that on the night of Pamela Mason's disappearance he had stopped his Pontiac on the side of the highway opposite the place where the body was found. He claimed the car was stuck in the snow. Two witnesses, who had stopped and asked him if he needed help, testified that his car was not stuck.

illegal, it is unnecessary to consider the applicability of *Cooper, supra,* to the subsequent search.[23]

It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Cf. *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 358; *United States* v. *Lefkowitz,* 285 U. S. 452, 465; *Steele* v. *United States,* 267 U. S. 498; *Stanley* v. *Georgia,* 394 U. S. 557, 571 (STEWART, J., concurring in result). Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect. *Warden* v. *Hayden, supra;* cf. *Hester* v. *United States,* 265 U. S. 57. And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant.[24] *Chimel* v. *California,* 395

---

[23] See nn. 12 and 21, *supra.*

[24] The "plain view" exception to the warrant requirement is not in conflict with the law of search incident to a valid arrest expressed in *Chimel* v. *California,* 395 U. S. 752. The Court there held that "[t]here is ample justification . . . for a search of the arrestee's person and the area 'within his immediate control'—construing that

U. S., at 762–763. Finally, the "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. *Harris* v. *United States,* 390 U. S. 234; *Frazier* v. *Cupp,* 394 U. S. 731; *Ker* v. *California,* 374 U. S., at 43. Cf. *Lewis* v. *United States,* 385 U. S. 206.

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.,* at 763. The "plain view" doctrine would normally justify as well the seizure of other evidence that came to light during such an appropriately limited search." The Court in *Chimel* went on to hold that "[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant." *Ibid.* Where, however, the arresting officer inadvertently comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee.

Cf. *Stanley* v. *Georgia, supra,* at 571–572 (STEWART, J., concurring in result).

The rationale for the "plain view" exception is evident if we keep in mind the two distinct constitutional protections served by the warrant requirement. First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that *any* intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity. See, *e. g., McDonald* v. *United States,* 335 U. S. 451; *Warden* v. *Hayden,* 387 U. S. 294; *Katz* v. *United States,* 389 U. S. 347; *Chimel* v. *California,* 395 U. S., at 761–762. The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings. See, *e. g., Boyd* v. *United States,* 116 U. S., at 624–630; *Marron* v. *United States,* 275 U. S. 192, 195–196; *Stanford* v. *Texas,* 379 U. S. 476. The warrant accomplishes this second objective by requiring a "particular description" of the things to be seized.

The "plain view" doctrine is not in conflict with the first objective because plain view does not occur until a search is in progress. In each case, this initial intrusion is justified by a warrant or by an exception such as "hot pursuit" or search incident to a lawful arrest, or by an extraneous valid reason for the officer's presence. And, given the initial intrusion, the seizure of an object in plain view is consistent with the second objective, since it does not convert the search into a general or exploratory one. As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. Where, once an otherwise lawful search is in progress, the police inadvertently come upon

a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it.

The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. *Taylor* v. *United States,* 286 U. S. 1; *Johnson* v. *United States,* 333 U. S. 10; *McDonald* v. *United States,* 335 U. S. 451; *Jones* v. *United States,* 357 U. S. 493, 497–498; *Chapman* v. *United States,* 365 U. S. 610; *Trupiano* v. *United States,* 334 U. S. 699.[25]

---

[25] *Trupiano* v. *United States, supra,* applied the principle in circumstances somewhat similar to those here. Federal law enforcement officers had infiltrated an agent into a group engaged in manufacturing illegal liquor. The agent had given them the fullest possible description of the layout and equipment of the illegal distillery. Although they had ample opportunity to do so, the investigators failed to procure search or arrest warrants. Instead, they staged a warrantless nighttime raid on the premises. After entering the property, one of the officers looked through the doorway of a shed, and saw one of the criminals standing beside an illegal distillery. The officer entered, made a legal arrest, and seized the still. This Court held it inadmissible at trial, rejecting the Government's argument based on "the long line of cases recognizing that an arresting officer may look around at the time of the arrest and

The second limitation is that the discovery of evidence in plain view must be inadvertent.[26] The rationale of the exception to the warrant requirement, as just stated,

seize those fruits and evidences of crime or those contraband articles which are in plain sight and in his immediate and discernible presence." 334 U. S., at 704. The Court reasoned that there was no excuse whatever for the failure of the agents to obtain a warrant before entering the property, and that the mere fact that a suspect was arrested in the proximity of the still provided no "exigent circumstance" to validate a warrantless seizure. The scope of the intrusion permitted to make the valid arrest did not include a warrantless search for and seizure of a still whose exact location and illegal use were known well in advance. The fact that at the time of the arrest the still was in plain view and nearby was therefore irrelevant. The agents were in exactly the same position as the policemen in *Taylor* v. *United States*, 286 U. S. 1, who had unmistakable evidence of sight and smell that contraband liquor was stored in a garage, but nonetheless violated the Fourth Amendment when they entered and seized it without a warrant.

*Trupiano*, to be sure, did not long remain undisturbed. The extremely restrictive view taken there of the allowable extent of a search and seizure incident to lawful arrest was rejected in *United States* v. *Rabinowitz*, 339 U. S. 56. See *Chimel* v. *California*, 395 U. S. 752. The case demonstrates, however, the operation of the general principle that "plain view" alone can never justify a warrantless seizure. Cf. n. 24, *supra*.

[26] None of the cases cited in Part III-C of the concurring and dissenting opinion of MR. JUSTICE BLACK casts any doubt upon this conclusion. In *Steele* v. *United States*, 267 U. S. 498, agents observed cases marked "Whiskey" being taken into a building from a truck. On this basis, they obtained a warrant to search the premises for contraband liquor. In the course of the search, they came upon a great deal of whiskey and gin—not that they had seen unloaded— and various bottling equipment, and seized all they found.

In *Warden* v. *Hayden*, 387 U. S. 294, the police entered and searched a house in hot pursuit of a fleeing armed robber. The Court pointed out that "[s]peed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U. S., at 299. The Court then established

is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as *"per se*

---

with painstaking care that the various articles of clothing seized were discovered during a search directed at the robber and his weapons. *Id.,* at 299–300.

In *United States* v. *Lee,* 274 U. S. 559, a Coast Guard patrol approached a boat on the high seas at night. A searchlight was turned on the boat and revealed cases of contraband. The liquor subsequently seized was never introduced in evidence, but the seizing officers were allowed to testify to what they had seen. As the Court put it: "A later trespass by the officers, if any, did not render inadmissible in evidence knowledge legally obtained." 274 U. S., at 563.

In *Marron* v. *United States,* 275 U. S. 192, officers raided a speakeasy with a warrant to search for and seize contraband liquor. They arrested the bartender and seized a number of bills and other papers in plain view on the bar. While searching a closet for liquor they came across a ledger kept in the operation of the illegal business, which they also seized. There is no showing whatever that these seizures outside the warrant were planned in advance. The *Marron* Court upheld them as "incident" to the arrest. The "plain view" aspect of the case was later emphasized in order to avoid the implication that arresting officers are entitled to make an exploratory search of the premises where the arrest occurs. See *Go-Bart Importing Co.* v. *United States,* 282 U. S., at 358; *United States* v. *Lefkowitz,* 285 U. S. 452, 465; *United States* v. *Rabinowitz,* 339 U. S., at 78 (Frankfurter, J., dissenting). Thus *Marron,* like *Steele, supra, Warden, supra,* and *Lee, supra,* can hardly be cited for the proposition that the police may justify a planned warrantless seizure by maneuvering themselves within "plain view" of the object they want.

Finally, *Ker* v. *California,* 374 U. S. 23, is fully discussed in n. 28, *infra.*

unreasonable" in the absence of "exigent circumstances."

If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of "Warrants . . . particularly describing . . . [the] things to be seized." The initial intrusion may, of course, be legitimated not by a warrant but by one of the exceptions to the warrant requirement, such as hot pursuit or search incident to lawful arrest. But to extend the scope of such an intrusion to the seizure of objects—not contraband nor stolen nor dangerous in themselves—which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure.[27]

---

[27] MR. JUSTICE BLACK laments that the Court today "abolishes seizure incident to arrest" (but see n. 24, *supra*), while MR. JUSTICE WHITE no less forcefully asserts that the Court's "new rule" will "accomplish nothing." In assessing these claims, it is well to keep in mind that we deal here with a *planned* warrantless seizure. This Court has never permitted the legitimation of a planned warrantless seizure on plain-view grounds, see n. 26, *supra,* and to do so here would be flatly inconsistent with the existing body of Fourth Amendment law. A long line of cases, of which those cited in the text, at n. 25, *supra,* are only a sample, make it clear beyond doubt that the mere fact that the police have legitimately obtained a plain view of a piece of incriminating evidence is not enough to justify a warrantless seizure. Although MR. JUSTICE BLACK and MR. JUSTICE WHITE appear to hold contrasting views of the import of today's decision, they are in agreement that this warrant requirement should be ignored whenever the seizing officers are able to arrange to make an arrest within sight of the object they are after. "The exceptions cannot be enthroned into the rule." *United States* v. *Rabinowitz,* 339 U. S., at 80 (Frankfurter, J., dissenting). We recognized the dangers of allowing the extent of Fourth Amendment protections to turn on the location of the arrestee in *Chimel* v. *California,* 395 U. S., at 767, noting that under the law of search inci-

In the light of what has been said, it is apparent that the "plain view" exception cannot justify the police seizure of the Pontiac car in this case. The police had ample opportunity to obtain a valid warrant; they knew the automobile's exact description and location well in advance; they intended to seize it when they came upon Coolidge's property. And this is not a case involving contraband or stolen goods or objects dangerous in themselves.[28]

dent to arrest as enunciated prior to *Chimel*, "law enforcement officials [had] the opportunity to engage in searches not justified by probable cause, by the simple expedient of arranging to arrest suspects at home rather than elsewhere." Cf. *Trupiano* v. *United States, supra,* n. 25, where the Court held:

"As we have seen, the existence of [the illegal still] and the desirability of seizing it *were known to the agents long before the seizure and formed one of the main purposes of the raid.* Likewise, the arrest of Antoniole [the person found in the shed with the still] . . . was a foreseeable event motivating the raid. But the precise location of the petitioners at the time of their arrest had no relation to the foreseeability or necessity of the seizure. The practicability of obtaining a search warrant did not turn upon whether Antoniole and the others were within the distillery building when arrested or upon whether they were then engaged in operating the illicit equipment. . . . Antoniole might well have been outside the building at that particular time. If that had been the case and he had been arrested in the farmyard, the entire argument advanced by the Government in support of the seizure without warrant would collapse. We do not believe that the applicability of the Fourth Amendment to the facts of this case depends upon such a fortuitous factor as the precise location of Antoniole at the time of the raid." 334 U. S., at 707–708. (Emphasis supplied.)

[28] *Ker* v. *California*, 374 U. S. 23, is not to the contrary. In that case, the police had probable cause to enter Ker's apartment and arrest him, and they made an entry for that purpose. They did not have a search warrant, but the Court held that "time . . . was of the essence," so that a warrant was unnecessary. As the police entered the living room, Ker's wife emerged from the adjacent kitchen. One of the officers moved to the door of the kitchen, looked in, and observed a brick of marihuana in plain view on

The seizure was therefore unconstitutional, and so was the subsequent search at the station house. Since evidence obtained in the course of the search was admitted at Coolidge's trial, the judgment must be reversed and the case remanded to the New Hampshire Supreme Court. *Mapp* v. *Ohio,* 367 U. S. 643.

### D

In his dissenting opinion today, MR. JUSTICE WHITE marshals the arguments that can be made against our interpretation of the "automobile" and "plain view" exceptions to the warrant requirement. Beyond the

---

a table. The officer brought Ker and his wife into the kitchen, questioned them, and, when they failed to explain the marihuana, arrested them, and seized the contraband. The police then searched the whole apartment and found various other incriminating evidence. The Court held that the general exploratory search of the whole apartment "was well within the limits upheld in *Harris* v. *United States* [331 U. S. 145]" for a search incident to a lawful arrest. The Court also rejected Ker's claim that the seizure of the brick of marihuana in the kitchen was illegal because the police had "searched" for it (by going to the door of the kitchen and looking in) before making any arrest. The Court reasoned that when Mrs. Ker emerged from the kitchen it was reasonable for the officer to go to the door and look in, and that when he saw the brick of marihuana he was not engaged in any "search" at all. Once he had arrested the Kers, the actual seizure of the brick was lawful because "incident" to the arrest. 374 U. S., at 42–43.

*Ker* is distinguishable from the present case on at least the following grounds: in *Ker,* the Court found that "the officers entered the apartment for the purpose of arresting George Ker," rather than for purposes of seizure or search, 374 U. S., at 42–43; exigent circumstances justified the failure to obtain a search warrant; the discovery of the brick of marihuana was fortuitous; the marihuana was contraband easily destroyed; and it was in the immediate proximity of the Kers at the moment of their arrest so that the seizure was unquestionably lawful under the search-incident law of the time, and might be lawful under the more restrictive standard of *Chimel* v. *California,* 395 U. S. 752. Not one of these elements was present in the case before us.

unstartling proposition that when a line is drawn there is often not a great deal of difference between the situations closest to it on either side, there is a single theme that runs through what he has to say about the two exceptions. Since that theme is a recurring one in controversies over the proper meaning and scope of the Fourth Amendment, it seems appropriate to treat his views in this separate section, rather than piecemeal.

Much the most important part of the conflict that has been so notable in this Court's attempts over a hundred years to develop a coherent body of Fourth Amendment law has been caused by disagreement over the importance of requiring law enforcement officers to secure warrants. Some have argued that a determination by a magistrate of probable cause as a precondition of any search or seizure is so essential that the Fourth Amendment is violated whenever the police might reasonably have obtained a warrant but failed to do so. Others have argued with equal force that a test of reasonableness, applied after the fact of search or seizure when the police attempt to introduce the fruits in evidence, affords ample safeguard for the rights in question, so that "[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." [29]

Both sides to the controversy appear to recognize a distinction between searches and seizures that take place on a man's property—his home or office—and those carried out elsewhere. It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the

---

[29] *United States* v. *Rabinowitz, supra,* at 66.

presence of "exigent circumstances." [30]   As to other kinds of intrusions, however, there has been disagreement about the basic rules to be applied, as our cases concerning automobile searches, electronic surveillance, street searches and administrative searches make clear. [31]

With respect to searches and seizures carried out on a suspect's premises, the conflict has been over the question of what qualifies as an "exigent circumstance."   It might appear that the difficult inquiry would be when it is that the police can enter upon a person's property to seize his "person . . . papers, and effects," without prior judicial approval.   The question of the scope of search and seizure once the police are on the premises would appear to be subsidiary to the basic issue of when intrusion is permissible.   But the law has not developed in this fashion.

The most common situation in which Fourth Amendment issues have arisen has been that in which the police enter the suspect's premises, arrest him, and then carry out a warrantless search and seizure of evidence. Where there is a warrant for the suspect's arrest, the evidence seized may later be challenged either on the ground that the warrant was improperly issued because there was not probable cause, [32] or on the ground that the police search and seizure went beyond that which they could carry out as an incident to the execution of the arrest warrant. [33]   Where the police act without an

---

[30] See the cases cited in nn. 5–8, *supra,* and in the text at n. 25, *supra.*

[31] See *Carroll* v. *United States, supra,* and cases discussed in Part II–B above (automobiles); *Katz* v. *United States, supra* (electronic surveillance); *Terry* v. *Ohio,* 392 U. S. 1; *Sibron* v. *New York,* 392 U. S. 40 (street searches); *Camara* v. *Municipal Court,* 387 U. S. 523; *See* v. *Seattle,* 387 U. S. 541 (administrative searches).

[32] *E. g., Giordenello* v. *United States,* 357 U. S. 480.

[33] *E. g., Marron* v. *United States, supra; United States* v. *Rabinowitz, supra.*

arrest warrant, the suspect may argue that an arrest warrant was necessary, that there was no probable cause to arrest,[34] or that even if the arrest was valid, the search and seizure went beyond permissible limits.[35] Perhaps because each of these lines of attack offers a plethora of litigable issues, the more fundamental question of when the police may arrest a man in his house without a warrant has been little considered in the federal courts. This Court has chosen on a number of occasions to assume the validity of an arrest and decide the case before it on the issue of the scope of permissible warrantless search. *E. g., Chimel* v. *California, supra.* The more common inquiry has therefore been: "Assuming a valid police entry for purposes of arrest, what searches and seizures may the police carry out without prior authorization by a magistrate?"

Two very broad, and sharply contrasting answers to this question have been assayed by this Court in the past. The answer of *Trupiano* v. *United States, supra,* was that *no* searches and seizures could be legitimated by the mere fact of valid entry for purposes of arrest, so long as there was no showing of special difficulties in obtaining a warrant for search and seizure. The contrasting answer in *Harris* v. *United States*, 331 U. S. 145, and *United States* v. *Rabinowitz, supra,* was that a valid entry for purposes of arrest served to legitimate warrantless searches and seizures throughout the premises where the arrest occurred, however spacious those premises might be.

The approach taken in *Harris* and *Rabinowitz* was open to the criticism that it made it so easy for the police to arrange to search a man's premises without a warrant

---

[34] *E. g., Wong Sun* v. *United States*, 371 U. S. 471.

[35] *E. g., Trupiano* v. *United States, supra; Warden* v. *Hayden, supra; Ker* v. *California, supra.*

that the Constitution's protection of a man's "effects" became a dead letter. The approach taken in *Trupiano*, on the other hand, was open to the criticism that it was absurd to permit the police to make an entry in the dead of night for purposes of seizing the "person" by main force, and then refuse them permission to seize objects lying around in plain sight. It is arguable that if the very substantial intrusion implied in the entry and arrest are "reasonable" in Fourth Amendment terms, then the less intrusive search incident to arrest must also be reasonable.

This argument against the *Trupiano* approach is of little force so long as it is assumed that the police must, in the absence of one of a number of defined exceptions based on "exigent circumstances," obtain an arrest warrant before entering a man's house to seize his person. If the Fourth Amendment requires a warrant to enter and seize the person, then it makes sense as well to require a warrant to seize other items that may be on the premises. The situation is different, however, if the police are under no circumstances required to obtain an arrest warrant before entering to arrest a person they have probable cause to believe has committed a felony. If no warrant is ever required to legitimate the extremely serious intrusion of a midnight entry to seize the person, then it can be argued plausibly that a warrant should never be required to legitimate a very sweeping search incident to such an entry and arrest. If the arrest without a warrant is *per se* reasonable under the Fourth Amendment, then it is difficult to perceive why a search incident in the style of *Harris* and *Rabinowitz* is not *per se* reasonable as well.

It is clear, then, that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is *per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that

searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined "exigent circumstances." This conflict came to the fore in *Chimel* v. *California, supra.* The Court there applied the basic rule that the "search incident to arrest" is an exception to the warrant requirement and that its scope must therefore be strictly defined in terms of the justifying "exigent circumstances." The exigency in question arises from the dangers of harm to the arresting officer and of destruction of evidence within the reach of the arrestee. Neither exigency can conceivably justify the far-ranging searches authorized under *Harris* and *Rabinowitz.* The answer of the dissenting opinion of MR. JUSTICE WHITE in *Chimel,* supported by no decision of this Court, was that a warrantless entry for the purpose of arrest on probable cause is legitimate and reasonable no matter what the circumstances. 395 U. S., at 776–780. From this it was said to follow that the full-scale search incident to arrest was also reasonable since it was a lesser intrusion. 395 U. S., at 772–775.

The same conflict arises in this case. Since the police knew of the presence of the automobile and planned all along to seize it, there was no "exigent circumstance" to justify their failure to obtain a warrant. The application of the basic rule of Fourth Amendment law therefore requires that the fruits of the warrantless seizure be suppressed. MR. JUSTICE WHITE's dissenting opinion, however, argues once again that so long as the police could reasonably make a warrantless nighttime entry onto Coolidge's property in order to arrest him, with no showing at all of an emergency, then it is absurd to prevent them from seizing his automobile as evidence of the crime.

MR. JUSTICE WHITE takes a basically similar approach to the question whether the search of the automobile in

this case can be justified under *Carroll* v. *United States, supra,* and *Chambers* v. *Maroney, supra. Carroll,* on its face, appears to be a classic example of the doctrine that warrantless searches are *per se* unreasonable in the absence of exigent circumstances. Every word in the opinion indicates the Court's adherence to the under-lying rule and its care in delineating a limited exception. Read thus, the case quite evidently does not extend to the situation at bar. Yet if we take the viewpoint of a judge called on only to decide in the abstract, after the fact, whether the police have behaved "reasonably" under all the circumstances—in short if we simply ignore the warrant requirement—*Carroll* comes to stand for something more. The stopping of a vehicle on the open highway and a subsequent search amount to a major interference in the lives of the occupants. *Carroll* held such an interference to be reasonable without a warrant, given probable cause. It may be thought to follow *a fortiori* that the seizure and search here—where there was no stopping and the vehicle was unoccupied—were also reasonable, since the intrusion was less substantial, although there were no exigent circumstances whatever. Using reasoning of this sort, it is but a short step to the position that it is *never* necessary for the police to obtain a warrant before searching and seizing an automobile, provided that they have probable cause. And MR. JUS-TICE WHITE appears to adopt exactly this view when he proposes that the Court should "treat searches of auto-mobiles as we do the arrest of a person."

If we were to accept MR. JUSTICE WHITE's view that warrantless entry for purposes of arrest and warrantless seizure and search of automobiles are *per se* reasonable, so long as the police have probable cause, it would be difficult to see the basis for distinguishing searches of houses and seizures of effects. If it is reasonable for the police to make a warrantless nighttime entry for the pur-

pose of arresting a person in his bed, then surely it must
be reasonable as well to make a warrantless entry to
search for and seize vital evidence of a serious crime.
If the police may, without a warrant, seize and search
an unoccupied vehicle parked on the owner's private
property, not being used for any illegal purpose, then it
is hard to see why they need a warrant to seize and
search a suitcase, a trunk, a shopping bag, or any other
portable container in a house, garage, or back yard.

The fundamental objection, then, to the line of argu-
ment adopted by MR. JUSTICE WHITE in his dissent in
this case and in *Chimel* v. *California, supra,* is that it
proves too much. If we were to agree with MR. JUSTICE
WHITE that the police may, whenever they have prob-
able cause, make a warrantless entry for the purpose of
making an arrest, and that seizures and searches of auto-
mobiles are likewise *per se* reasonable given probable
cause, then by the same logic *any* search or seizure could
be carried out without a warrant, and we would simply
have read the Fourth Amendment out of the Constitu-
tion. Indeed, if MR. JUSTICE WHITE is correct that it
has generally been assumed that the Fourth Amendment
is not violated by the warrantless entry of a man's house
for purposes of arrest, it might be wise to re-examine the
assumption. Such a re-examination "would confront us
with a grave constitutional question, namely, whether
the forceful nighttime entry into a dwelling to arrest a
person reasonably believed within, upon probable cause
that he had committed a felony, under circumstances
where no reason appears why an arrest warrant could
not have been sought, is consistent with the Fourth
Amendment." *Jones* v. *United States,* 357 U. S., at
499–500.

None of the cases cited by MR. JUSTICE WHITE dis-
poses of this "grave constitutional question." The case
of *Warden* v. *Hayden, supra,* where the Court elaborated

a "hot pursuit" justification for the police entry into the defendant's house without a warrant for his arrest, certainly stands by negative implication for the proposition that an arrest warrant is required in the absence of exigent circumstances. See also *Davis* v. *Mississippi,* 394 U. S. 721, 728; *Wong Sun* v. *United States,* 371 U. S., at 481–482. The Court of Appeals for the District of Columbia Circuit, sitting *en banc,* has unanimously reached the same conclusion.[36] But we find it unnecessary to decide the question in this case. The rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only, to a few specifically established and well-delineated exceptions," [37] is not so frail that its continuing vitality depends on the fate of a supposed doctrine of warrantless arrest. The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow "weighed" against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the "well-intentioned but mistakenly over-zealous executive officers" [38] who are a part of any system of law enforcement. If it is to be a true guide to constitutional police action, rather than just a pious phrase, then "[t]he exceptions cannot be enthroned into the rule." *United States* v. *Rabinowitz, supra,* at 80 (Frankfurter, J., dissenting). The confinement of the exceptions to their appropriate scope was the function of *Chimel* v. *California, supra,* where we dealt with the

---

[36] *Dorman* v. *United States,* 140 U. S. App. D. C. 313, 435 F. 2d 385 (1970).

[37] *Katz* v. *United States, supra,* at 357.

[38] *Gouled* v. *United States,* 255 U. S., at 304.

assumption that a search "incident" to a lawful arrest may encompass all of the premises where the arrest occurs, however spacious. The "plain view" exception is intimately linked with the search-incident exception, as the cases discussed in Part C above have repeatedly shown. To permit warrantless plain-view seizures without limit would be to undo much of what was decided in *Chimel*, as the similar arguments put forward in dissent in the two cases indicate clearly enough.

Finally, a word about *Trupiano* v. *United States, supra.* Our discussion of "plain view" in Part C above corresponds with that given in *Trupiano*. Here, as in *Trupiano*, the determining factors are advance police knowledge of the existence and location of the evidence, police intention to seize it, and the ample opportunity for obtaining a warrant. See 334 U. S., at 707–708 and n. 27, *supra.* However, we do not "reinstate" *Trupiano*, since we cannot adopt all its implications. To begin with, in *Chimel* v. *California, supra,* we held that a search of the person of an arrestee and of the area under his immediate control could be carried out without a warrant. We did not indicate there, and do not suggest here, that the police must obtain a warrant if they anticipate that they will find specific evidence during the course of such a search. See n. 24, *supra.* And as to the automobile exception, we do not question the decisions of the Court in *Cooper* v. *California,* 386 U. S. 58, and *Chambers* v. *Maroney, supra,* although both are arguably inconsistent with *Trupiano*.

MR. JUSTICE WHITE's dissent characterizes the coexistence of *Chimel, Cooper, Chambers,* and this case as "punitive," "extravagant," "inconsistent," "without apparent reason," "unexplained;" and "inexplicable." *Post,* at 517, 519, 521. It is urged upon us that we have here a "ready opportunity, one way or another,

to bring clarity and certainty to a body of law that lower courts and law enforcement officials often find confusing." *Post*, at 521. Presumably one of the ways in which MR. JUSTICE WHITE believes we might achieve clarity and certainty would be the adoption of his proposal that we treat entry for purposes of arrest and seizure of an automobile alike as *per se* reasonable on probable cause. Such an approach might dispose of this case clearly and certainly enough, but, as we have tried to show above, it would cast into limbo the whole notion of a Fourth Amendment warrant requirement. And it is difficult to take seriously MR. JUSTICE WHITE's alternative suggestion that clarity and certainty, as well as coherence and credibility, might also be achieved by modifying *Chimel* and overruling *Chambers* and *Cooper*. Surely, quite apart from his strong disagreement on the merits, he would take vehement exception to any such cavalier treatment of this Court's decisions.

Of course, it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony. The decisions of the Court over the years point in differing directions and differ in emphasis. No trick of logic will make them all perfectly consistent. But it is no less nonsense to suggest, as does MR. JUSTICE WHITE, *post*, at 521, 520, that we cease today "to strive for clarity and consistency of analysis," or that we have "abandoned any attempt" to find reasoned distinctions in this area. The time is long past when men believed that development of the law must always proceed by the smooth incorporation of new situations into a single coherent analytical framework. We need accept neither the "clarity and certainty" of a Fourth Amendment without a warrant requirement nor the facile consistency obtained by wholesale overruling of recently decided cases. A remark by

Mr. Justice Harlan concerning the Fifth Amendment is applicable as well to the Fourth:

"There are those, I suppose, who would put the 'liberal construction' approach of cases like *Miranda* [v. *Arizona,* 384 U. S. 436,] and *Boyd.* v. *United States,* 116 U. S. 616 (1886), side-by-side with the balancing approach of *Schmerber* [v. *California,* 384 U. S. 757,] and perceive nothing more subtle than a set of constructional antinomies to be utilized as convenient bootstraps to one result or another. But I perceive in these cases the essential tension that springs from the uncertain mandate which this provision of the Constitution gives to this Court." *California* v. *Byers,* 402 U. S. 424, 449–450 (concurring in judgment).

We are convinced that the result reached in this case is correct, and that the principle it reflects—that the police must obtain a warrant when they intend to seize an object outside the scope of a valid search incident to arrest—can be easily understood and applied by courts and law enforcement officers alike. It is a principle that should work to protect the citizen without overburdening the police, and a principle that preserves and protects the guarantees of the Fourth Amendment.

## III

Because of the prospect of a new trial, the efficient administration of justice counsels consideration of the second substantial question under the Fourth and Fourteenth Amendments presented by this case. The petitioner contends that when the police obtained a rifle and articles of his clothing from his home on the night of Sunday, February 2, 1964, while he was being interrogated at the police station, they engaged in a search and seizure violative of the Constitution. In order to

understand this contention, it is necessary to review in some detail the circumstances of the February 2 episode.

## A

The lie-detector test administered to Coolidge in Concord on the afternoon of the 2d was inconclusive as to his activities on the night of Pamela Mason's disappearance, but during the course of the test Coolidge confessed to stealing $375 from his employer. After the group returned from Concord to Manchester, the interrogation about Coolidge's movements on the night of the disappearance continued, and Coolidge apparently made a number of statements which the police immediately checked out as best they could. The decision to send two officers to the Coolidge house to speak with Mrs. Coolidge was apparently motivated in part by a desire to check his story against whatever she might say, and in part by the need for some corroboration of his admission to the theft from his employer. The trial judge found as a fact, and the record supports him, that at the time of the visit the police knew very little about the weapon that had killed Pamela Mason. The bullet that had been retrieved was of small caliber, but the police were unsure whether the weapon was a rifle or a pistol. During the extensive investigation following the discovery of the body, the police had made it a practice to ask all those questioned whether they owned any guns, and to ask the owners for permission to run tests on those that met the very general description of the murder weapon. The trial judge found as a fact that when the police visited Mrs. Coolidge on the night of the 2d, they were unaware of the previous visit during which Coolidge had shown other officers three guns, and that they were not motivated by a desire to find the murder weapon.

The two plainclothesmen asked Mrs. Coolidge whether her husband had been at home on the night of the murder victim's disappearance, and she replied that he had not. They then asked her if her husband owned any guns. According to her testimony at the pretrial suppression hearing, she replied, "Yes, I will get them in the bedroom." One of the officers replied, "We will come with you." The three went into the bedroom where Mrs. Coolidge took all four guns out of the closet. Her account continued:

> "A. I believe I asked if they wanted the guns. One gentleman said, 'No'; then the other gentleman turned around and said, 'We might as well take them.' I said, 'If you would like them, you may take them.'
>
> "Q. Did you go further and say, 'We have nothing to hide.'?
>
> "A. I can't recall if I said that then or before. I don't recall.
>
> "Q. But at some time you indicated to them that as far as you were concerned you had nothing to hide, and they might take what they wanted?
>
> "A. That was it.
>
> .       .       .       .       .
>
> "Q. Did you feel at that time that you had something to hide?
>
> "A. No."

The two policemen also asked Mrs. Coolidge what her husband had been wearing on the night of the disappearance. She then produced four pairs of trousers and indicated that her husband had probably worn either of two of them on that evening. She also brought out a hunting jacket. The police gave her a receipt for the guns and the clothing, and, after a search of the Coolidge cars not here in issue, took the various articles to the police station.

## B

The first branch of the petitioner's argument is that when Mrs. Coolidge brought out the guns and clothing, and then handed them over to the police, she was acting as an "instrument" of the officials, complying with a "demand" made by them. Consequently, it is argued, Coolidge was the victim of a search and seizure within the constitutional meaning of those terms. Since we cannot accept this interpretation of the facts, we need not consider the petitioner's further argument that Mrs. Coolidge could not or did not "waive" her husband's constitutional protection against unreasonable searches and seizures.

Had Mrs. Coolidge, wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence. Cf. *Burdeau* v. *McDowell,* 256 U. S. 465. The question presented here is whether the conduct of the police officers at the Coolidge house was such as to make her actions their actions for purposes of the Fourth and Fourteenth Amendments and their attendant exclusionary rules. The test, as the petitioner's argument suggests, is whether Mrs. Coolidge, in light of all the circumstances of the case, must be regarded as having acted as an "instrument" or agent of the state when she produced her husband's belongings. Cf. *United States* v. *Goldberg,* 330 F. 2d 30 (CA3), cert. denied, 377 U. S. 953 (1964); *People* v. *Tarantino,* 45 Cal. 2d 590, 290 P. 2d 505 (1955); see *Byars* v. *United States,* 273 U. S. 28; *Gambino* v. *United States,* 275 U. S. 310.

In a situation like the one before us there no doubt always exist forces pushing the spouse to cooperate with

the police. Among these are the simple but often power-
ful convention of openness and honesty, the fear that
secretive behavior will intensify suspicion, and uncer-
tainty as to what course is most likely to be helpful to
the absent spouse. But there is nothing constitutionally
suspect in the existence, without more, of these incentives
to full disclosure or active cooperation with the police.
The exclusionary rules were fashioned "to prevent, not to
repair," and their target is official misconduct. They
are "to compel respect for the constitutional guaranty in
the only effectively available way—by removing the in-
centive to disregard it." *Elkins* v. *United States,* 364
U. S. 206, 217. But it is no part of the policy underlying
the Fourth and Fourteenth Amendments to discourage
citizens from aiding to the utmost of their ability in the
apprehension of criminals. If, then, the exclusionary
rule is properly applicable to the evidence taken from
the Coolidge house on the night of February 2, it must
be upon the basis that some type of unconstitutional
police conduct occurred.

Yet it cannot be said that the police should have ob-
tained a warrant for the guns and clothing before they
set out to visit Mrs. Coolidge, since they had no intention
of rummaging around among Coolidge's effects or of
dispossessing him of any of his property. Nor can it be
said that they should have obtained Coolidge's permission
for a seizure they did not intend to make. There was
nothing to compel them to announce to the suspect that
they intended to question his wife about his movements
on the night of the disappearance or about the theft from
his employer. Once Mrs. Coolidge had admitted them,
the policemen were surely acting normally and properly
when they asked her, as they had asked those questioned
earlier in the investigation, including Coolidge himself,
about any guns there might be in the house. The ques-

tion concerning the clothes Coolidge had been wearing on the night of the disappearance was logical and in no way coercive. Indeed, one might doubt the competence of the officers involved had they not asked exactly the questions they did ask. And surely when Mrs. Coolidge of her own accord produced the guns and clothes for inspection, rather than simply describing them, it was not incumbent on the police to stop her or avert their eyes.

The crux of the petitioner's argument must be that when Mrs. Coolidge asked the policemen whether they wanted the guns, they should have replied that they could not take them, or have first telephoned Coolidge at the police station and asked his permission to take them, or have asked her whether she had been authorized by her husband to release them. Instead, after one policeman had declined the offer, the other turned and said, "We might as well take them," to which Mrs. Coolidge replied, "If you would like them, you may take them."

In assessing the claim that this course of conduct amounted to a search and seizure, it is well to keep in mind that Mrs. Coolidge described her own motive as that of clearing her husband, and that she believed that she had nothing to hide. She had seen her husband him-self produce his guns for two other policemen earlier in the week, and there is nothing to indicate that she realized that he had offered only three of them for inspection on that occasion. The two officers who questioned her behaved, as her own testimony shows, with perfect courtesy. There is not the slightest implication of an attempt on their part to coerce or dominate her, or, for that matter, to direct her actions by the more subtle techniques of suggestion that are available to officials in circumstances like these. To hold that the conduct of the police here was a search and seizure would be to hold, in effect, that a criminal suspect has constitutional protection against

the adverse consequences of a spontaneous, good-faith effort by his wife to clear him of suspicion.[39]

The judgment is reversed and the case is remanded to the Supreme Court of New Hampshire for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE HARLAN, concurring.

From the several opinions that have been filed in this case it is apparent that the law of search and seizure is due for an overhauling. State and federal law enforcement officers and prosecutorial authorities must find quite intolerable the present state of uncertainty, which extends even to such an everyday question as the circumstances under which police may enter a man's property to arrest him and seize a vehicle believed to have been used during the commission of a crime.

I would begin this process of re-evaluation by overruling *Mapp* v. *Ohio,* 367 U. S. 643 (1961), and *Ker* v. *California,* 374 U. S. 23 (1963). The former of these cases made the federal "exclusionary rule" applicable to the States. The latter forced the States to follow all the ins and outs of this Court's Fourth Amendment decisions, handed down in federal cases.

In combination *Mapp* and *Ker* have been primarily responsible for bringing about serious distortions and incongruities in this field of constitutional law. Basically these have had two aspects, as I believe an examination of our more recent opinions and certiorari docket will show. First, the States have been put in a federal mold with respect to this aspect of criminal law enforcement, thus depriving the country of the opportunity to observe

---

[39] Cf. Recent Cases, 79 Harv. L. Rev. 1513, 1519 (1966); Note, Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stan. L. Rev. 608 (1967).

the effects of different procedures in similar settings. See, e. g., Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970), suggesting that the assumed "deterrent value" of the exclusionary rule has never been adequately demonstrated or disproved, and pointing out that because of *Mapp* all comparative statistics are 10 years old and no new ones can be obtained. Second, in order to leave some room for the States to cope with their own diverse problems, there has been generated a tendency to relax federal requirements under the Fourth Amendment, which now govern state procedures as well. For an illustration of that tendency in another constitutional field, again resulting from the infelicitous "incorporation" doctrine, see *Williams* v. *Florida,* 399 U. S. 78 (1970). Until we face up to the basic constitutional mistakes of *Mapp* and *Ker,* no solid progress in setting things straight in search and seizure law will, in my opinion, occur.

But for *Mapp* and *Ker,* I would have little difficulty in voting to sustain this conviction, for I do not think that anything the State did in this case could be said to offend those values which are "at the core of the Fourth Amendment." *Wolf* v. *Colorado,* 338 U. S. 25, 27 (1949); cf. *Irvine* v. *California,* 347 U. S. 128 (1954); *Rochin* v. *California,* 342 U. S. 165 (1952).

Because of *Mapp* and *Ker,* however, this case must be judged in terms of federal standards, and on that basis I concur, although not without difficulty, in Parts I, II–D, and III of the Court's opinion and in the judgment of the Court.* It must be recognized that the case is a close one. The reason I am tipped in favor of MR. JUS-

---

*Because of my views as to the retroactivity of *Chimel* v. *California,* 395 U. S. 752 (1969), I do not believe the seizure of the Pontiac can be upheld as incident to Coolidge's arrest. See my separate opinion in *Mackey* v. *United States,* 401 U. S. 667, 675 (1971).

TICE STEWART's position is that a contrary result in this case would, I fear, go far toward relegating the warrant requirement of the Fourth Amendment to a position of little consequence in federal search and seizure law, a course which seems to me opposite to the one we took in *Chimel* v. *California*, 395 U. S. 752 (1969), two Terms ago.

Recent scholarship has suggested that in emphasizing the warrant requirement over the reasonableness of the search the Court has "stood the fourth amendment on its head" from a historical standpoint. T. Taylor, Two Studies in Constitutional Interpretation 23–24 (1969). This issue is perhaps most clearly presented in the case of a warrantless entry into a man's home to arrest him on probable cause. The validity of such entry was left open in *Jones* v. *United States*, 357 U. S. 493, 499–500 (1958), and although my Brothers WHITE and STEWART both feel that their contrary assumptions on this point are at the root of their disagreement in this case, *ante,* at 477–479; *post,* at 510–512, 521, the Court again leaves the issue open. *Ante,* at 481. In my opinion it does well to do so. This matter should not be decided in a state case not squarely presenting the issue and where it was not fully briefed and argued. I intimate no view on this subject, but until it is ripe for decision, I hope in a federal case, I am unwilling to lend my support to setting back the trend of our recent decisions.

MR. CHIEF JUSTICE BURGER, dissenting in part and concurring in part.

I join the dissenting opinion of MR. JUSTICE WHITE and in Parts II and III of MR. JUSTICE BLACK's concurring and dissenting opinion. I also agree with most of what is said in Part I of MR. JUSTICE BLACK's opinion, but I am not prepared to accept the proposition that the Fifth Amendment requires the exclusion of evidence

seized in violation of the Fourth Amendment. I join in Part III of MR. JUSTICE STEWART's opinion.

This case illustrates graphically the monstrous price we pay for the exclusionary rule in which we seem to have imprisoned ourselves. See my dissent in *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics, ante,* p. 411.

On the merits of the case I find not the slightest basis in the record to reverse this conviction. Here again the Court reaches out, strains, and distorts rules that were showing some signs of stabilizing, and directs a new trial which will be held more than seven years after the criminal acts charged.

Mr. Justice Stone, of the Minnesota Supreme Court, called the kind of judicial functioning in which the Court indulges today "bifurcating elements too infinitesimal to be split."

MR. JUSTICE BLACK, concurring and dissenting.

After a jury trial in a New Hampshire state court, petitioner was convicted of murder and sentenced to life imprisonment. Holding that certain evidence introduced by the State was seized during an "unreasonable" search and that the evidence was inadmissible under the judicially created exclusionary rule of the Fourth Amendment, the majority reverses that conviction. Believing that the search and seizure here was reasonable and that the Fourth Amendment properly construed contains no such exclusionary rule, I dissent.

The relevant facts are these. Pamela Mason, a 14-year-old school girl, lived with her mother and younger brother in Manchester, New Hampshire. She occasionally worked after school as a babysitter and sought such work by posting a notice on a bulletin board in a local laundromat. On January 13, 1964, she arrived home from school about 4:15 p. m. Pamela's mother told her

that a man had called seeking a babysitter for that evening and said that he would call again later. About 4:30 p. m., after Pamela's mother had left for her job as a waitress at a nearby restaurant, Pamela received a phone call. Her younger brother, who answered the call but did not overhear the conversation, later reported that the caller was a man. After the call, Pamela prepared dinner for her brother and herself, then left the house about 6 p. m. Her family never again saw her alive. Eight days later, on January 21, 1964, Pamela's frozen body was discovered in a snowdrift beside an interstate highway a few miles from her home. Her throat had been slashed and she had been shot in the head. Medical evidence showed that she died some time between 8 and 10 p. m. on January 13, the night she left home.

A manhunt ensued. Two witnesses informed the police that about 9:30 p. m. on the night of the murder they had stopped to offer assistance to a man in a 1951 Pontiac automobile which was parked beside the interstate highway near the point where the little girl's dead body was later found. Petitioner came under suspicion seven days after the body was discovered when one of his neighbors reported to the police that petitioner had been absent from his home between 5 and 11 p. m. on January 13, the night of the murder. Petitioner owned a 1951 Pontiac automobile that matched the description of the car which the two witnesses reported seeing parked where the girl's body had been found. The police first talked with petitioner at his home on the evening of January 28, fifteen days after the girl was killed, and arranged for him to come to the police station the following Sunday, February 2, 1964. He went to the station that Sunday and answered questions concerning his activities on the night of the murder, telling the police that he had been shopping in a neighboring town at the

time the murder was committed. During questioning, petitioner confessed to having committed an unrelated larceny from his employer and was held overnight at the police station in connection with that offense. On the next day, he was permitted to go home.

While petitioner was being questioned at the police station on February 2, two policemen went to petitioner's home to talk with his wife. They asked what firearms the petitioner owned and his wife produced two shotguns and two rifles which she voluntarily offered to the police. Upon examination the University of Rhode Island Criminal Investigation Laboratory concluded that one of the firearms, a Mossberg .22-caliber rifle, had fired the bullet found in the murdered girl's brain.

Petitioner admitted that he was a frequent visitor to the laundromat where Pamela posted her babysitting notice and that he had been there on the night of the murder. The following day a knife belonging to petitioner, which could have inflicted the murdered girl's knife wounds, was found near that laundromat. The police also learned that petitioner had unsuccessfully contacted four different persons before the girl's body had been discovered in an attempt to fabricate an alibi for the night of January 13.

On February 19, 1964, all this evidence was presented to the state attorney general who was authorized under New Hampshire law to issue arrest and search warrants. The attorney general considered the evidence and issued a warrant for petitioner's arrest and four search warrants including a warrant for the seizure and search of petitioner's Pontiac automobile.

On the day the warrants issued, the police went to the petitioner's residence and placed him under arrest. They took charge of his 1951 Pontiac which was parked in plain view in the driveway in front of the house, and, two hours later, towed the car to the police station.

During the search of the automobile at the station, the police obtained vacuum sweepings of dirt and other fine particles which matched like sweepings taken from the clothes of the murdered girl. Based on the similarity between the sweepings taken from petitioner's automobile and those taken from the girl's clothes, experts who testified at trial concluded that Pamela had been in the petitioner's car. The rifle given to the police by petitioner's wife was also received in evidence.

Petitioner challenges his conviction on the ground that the rifle obtained from his wife and the vacuum sweepings taken from his car were seized in violation of the Fourth Amendment and were improperly admitted at trial. With respect to the rifle voluntarily given to the police by petitioner's wife, the majority holds that it was properly received in evidence. I agree. But the Court reverses petitioner's conviction on the ground that the sweepings taken from his car were seized during an illegal search and for this reason the admission of the sweepings into evidence violated the Fourth Amendment. I dissent.

I

The Fourth Amendment prohibits unreasonable searches and seizures. The Amendment says nothing about consequences. It certainly nowhere provides for the exclusion of evidence as the remedy for violation. The Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." No examination of that text can find an exclusionary rule by a mere process of construction. Apparently the first suggestion that the Fourth Amendment somehow embodied a rule of evidence came

in Justice Bradley's majority opinion in *Boyd* v. *United States,* 116 U. S. 616 (1886). The holding in that case was that ordinarily a person may not be compelled to produce his private books and papers for use against him as proof of crime. That decision was a sound application of accepted principles of common law and the command of the Fifth Amendment that no person shall be compelled to be a witness against himself. But Justice Bradley apparently preferred to formulate a new exclusionary rule from the Fourth Amendment rather than rely on the already existing exclusionary rule contained in the language of the Fifth Amendment. His opinion indicated that compulsory production of such evidence at trial violated the Fourth Amendment. Mr. Justice Miller, with whom Chief Justice Waite joined, concurred solely on the basis of the Fifth Amendment, and explicitly refused to go along with Justice Bradley's novel reading of the Fourth Amendment. It was not until 1914, some 28 years after *Boyd* and when no member of the *Boyd* Court remained, that the Court in *Weeks* v. *United States,* 232 U. S. 383, stated that the Fourth Amendment itself barred the admission of evidence seized in violation of the Fourth Amendment. The *Weeks* opinion made no express confession of a break with the past. But if it was merely a proper reading of the Fourth Amendment, it seems strange that it took this Court nearly 125 years to discover the true meaning of those words. The truth is that the source of the exclusionary rule simply cannot be found in the Fourth Amendment. That Amendment did not when adopted, and does not now, contain any constitutional rule barring the admission of illegally seized evidence.

In striking contrast to the Fourth Amendment, the Fifth Amendment states in express, unambiguous terms that no person "shall be compelled in any criminal case

to be a witness against himself." The Fifth Amendment in and of itself directly and explicitly commands its own exclusionary rule—a defendant cannot be compelled to give evidence against himself. Absent congressional action taken pursuant to the Fourth Amendment, if evidence is to be excluded, it must be under the Fifth Amendment, not the Fourth. That was the point so ably made in the concurring opinion of Justice Miller, joined by Chief Justice Waite, in *Boyd* v. *United States, supra,* and that was the thrust of my concurring opinion in *Mapp* v. *Ohio,* 367 U. S. 643, 661 (1961).

The evidence seized by breaking into Mrs. Mapp's house and the search of all her possessions, was excluded from evidence, not by the Fourth Amendment which contains no exclusionary rule, but by the Fifth Amendment which does. The introduction of such evidence compels a man to be a witness against himself, and evidence so compelled must be excluded under the Fifth Amendment, not because the Court says so, but because the Fifth Amendment commands it.

The Fourth Amendment provides a constitutional means by which the Government can act to obtain evidence to be used in criminal prosecutions. The people are obliged to yield to a proper exercise of authority under that Amendment.[1] Evidence properly seized under the Fourth Amendment, of course, is admissible at trial. But nothing in the Fourth Amendment provides that evidence seized in violation of that Amendment must be excluded.

The majority holds that evidence it views as improperly seized in violation of its ever changing concept of the Fourth Amendment is inadmissible. The majority

---

[1] There are of course certain searches which constitutionally cannot be authorized even with a search warrant or subpoena. See, *e. g., Boyd* v. *United States,* 116 U. S. 616 (1886); *Rochin* v. *California,* 342 U. S. 165, 174 (1952) (BLACK, J., concurring); *Schmerber* v. *California,* 384 U. S. 757, 773 (1966) (BLACK, J., dissenting).

treats the exclusionary rule as a judge-made rule of evidence designed and utilized to enforce the majority's own notions of proper police conduct. The Court today announces its new rules of police procedure in the name of the Fourth Amendment, then holds that evidence seized in violation of the new "guidelines" is automatically inadmissible at trial. The majority does not purport to rely on the Fifth Amendment to exclude the evidence in this case. Indeed, it could not. The majority prefers instead to rely on "changing times" and the Court's role as it sees it, as the administrator in charge of regulating the contacts of officials with citizens. The majority states that in the absence of a better means of regulation, it applies a court-created rule of evidence.

I readily concede that there is much recent precedent for the majority's present announcement of yet another new set of police operating procedures. By invoking this rulemaking power found not in the words but somewhere in the "spirit" of the Fourth Amendment, the Court has expanded that Amendment beyond recognition. And each new step is justified as merely a logical extension of the step before.

It is difficult for me to believe the Framers of the Bill of Rights intended that the police be required to prove a defendant's guilt in a "little trial" before the issuance of a search warrant. But see *Aguilar* v. *Texas,* 378 U. S. 108 (1964); *Spinelli* v. *United States,* 393 U. S. 410 (1969). No such proceeding was required before or after the adoption of the Fourth Amendment, until this Court decided *Aguilar* and *Spinelli.* Likewise, eavesdroppers were deemed to be competent witnesses in both English and American courts up until this Court in its Fourth Amendment "rulemaking" capacity undertook to lay down rules for electronic surveillance. *Berger* v. *New York,* 388 U. S. 41, 70 (1967) (BLACK, J., dissenting); *Katz* v. *United States,* 389 U. S. 347, 364 (1967) (BLACK, J., dis-

senting). The reasonableness of a search incident to an arrest, extending to areas under the control of the defendant and areas where evidence may be found, was an established tenet of English common law, and American constitutional law after adoption of the Fourth Amendment—that is, until *Chimel* v. *California*, 395 U. S. 752 (1969). The broad, abstract, and ambiguous concept of "privacy" is now unjustifiably urged as a comprehensive substitute for the Fourth Amendment's guarantee against "unreasonable searches and seizures." *Griswold* v. *Connecticut*, 381 U. S. 479 (1965).

Our Government is founded upon a written Constitution. The draftsmen expressed themselves in careful and measured terms corresponding with the immense importance of the powers delegated to them. The Framers of the Constitution, and the people who adopted it, must be understood to have used words in their natural meaning, and to have intended what they said. The Constitution itself contains the standards by which the seizure of evidence challenged in the present case and the admissibility of that evidence at trial is to be measured in the absence of congressional legislation. It is my conclusion that both the seizure of the rifle offered by petitioner's wife and the seizure of the automobile at the time of petitioner's arrest were consistent with the Fourth Amendment and that the evidence so obtained under the circumstances shown in the record in this case could not be excluded under the Fifth Amendment.

## II

The majority holds that the warrant authorizing the seizure and search of petitioner's automobile was constitutionally defective and void. With respect to search warrants, the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place

to be searched, and the persons or things to be seized."
The majority concedes that the police did show probable
cause for the issuance of the warrant. The majority
does not contest that the warrant particularly described
the place to be searched, and the thing to be seized.

But compliance with state law and the requirements
of the Fourth Amendment apparently is not enough.
The majority holds that the state attorney general's
connection with the investigation automatically rendered
the search warrant invalid. In the first place, there is
no language in the Fourth Amendment which provides
any basis for the disqualification of the state attorney
general to act as a magistrate. He is a state official of
high office. The Fourth Amendment does not indi-
cate that his position of authority over state law
enforcement renders him ineligible to issue warrants
upon a showing of probable cause supported by oath
or affirmation. The majority's argument proceeds on
the "little trial" theory that the magistrate is to sit
as a judge and weigh the evidence and practically de-
termine guilt or innocence before issuing a warrant.
There is nothing in the Fourth Amendment to support
such a magnified view of the magistrate's authority. The
state attorney general was not barred by the Fourth
Amendment or any other constitutional provision from
issuing the warrant.

In the second place, the New Hampshire Supreme
Court held in effect that the state attorney general's par-
ticipation in the investigation of the case at the time
he issued the search warrant was "harmless error" if it
was error at all. I agree. It is difficult to imagine a
clearer showing of probable cause. There was no possi-
bility of prejudice because there was no room for dis-
cretion. Indeed, it could be said that a refusal to issue
a warrant on the showing of probable cause made in this
case would have been an abuse of discretion. In light

of the showing made by the police, there is no reasonable possibility that the state attorney general's own knowledge of the investigation contributed to the issuance of the warrant. I see no error in the state attorney general's action. But even if there was error, it was harmless beyond reasonable doubt. See *Harrington* v. *California*, 395 U. S. 250 (1969); *Chapman* v. *California*, 386 U. S. 18 (1967).

Therefore, it is my conclusion that the warrant authorizing the seizure and search of petitioner's automobile was constitutional under the Fourth Amendment, and that the evidence obtained during that search cannot be excluded under the Fifth Amendment. Moreover, I am of the view that, even if the search warrant had not issued, the search in this case nonetheless would have been constitutional under all three of the principles considered and rejected by the majority.

## III

It is important to point out that the automobile itself was evidence and was seized as such. Prior to the seizure the police had been informed by two witnesses that on the night of the murder they had seen an automobile parked near the point where the little girl's dead body was later discovered. Their description of the parked automobile matched petitioner's car. At the time of the seizure the identification of petitioner's automobile by the witnesses as the car they had seen on the night of the murder was yet to be made. The police had good reason to believe that the identification would be an important element of the case against the petitioner. Preservation of the automobile itself as evidence was a reasonable motivation for its seizure. Considered in light of the information in the hands of the New Hampshire police at the time of the seizure, I conclude that the seizure and search were constitutional, even had there been no search warrant, for the following among other reasons.

## A

First, the seizure of petitioner's automobile was valid as incident to a lawful arrest. The majority concedes that there was probable cause for petitioner's arrest. Upon arriving at petitioner's residence to make that arrest, the police saw petitioner's automobile which they knew fitted the description of the car observed by two witnesses at the place where the murdered girl's body had been found. The police arrested the petitioner and seized the automobile. The majority holds that because the police had to go into petitioner's residence in order to place petitioner under arrest, the contemporaneous seizure of the automobile outside the house was not incident to that arrest. I cannot accept this elevation of form over reason.

After stating that *Chimel* v. *California,* 395 U. S. 752 (1969), is inapplicable to this case, the majority goes on to formulate and apply a *per se* rule reaching far beyond *Chimel.* To do so, the majority employs a classic *non sequitur.* Because this Court has held that police arresting a defendant on the street in front of his house cannot go into that house and make a general search, it follows, says the majority, that the police having entered a house to make an arrest cannot step outside the house to seize clearly visible evidence. Even though the police, upon entering a doorway to make a valid arrest, would be authorized under the pre-*Chimel* law the majority purports to apply, to make a five-hour search of a four-room apartment, see *Harris* v. *United States,* 331 U. S. 145 (1947), the majority holds that the police could not step outside the doorway to seize evidence they passed on their way in. The majority reasons that as the doorway locks the policeman out, once entered, it must lock him in.

The test of reasonableness cannot be governed by such arbitrary rules. Each case must be judged on its

own particular facts. Here, there was no general exploration, only a direct seizure of important evidence in plain view from both inside as well as outside the house. On the facts of this case, it is my opinion that the seizure of petitioner's automobile was incident to his arrest and was reasonable under the terms of the Fourth Amendment.

## B

Moreover, under our decision last Term in *Chambers* v. *Maroney,* 399 U. S. 42 (1970), the police were entitled not only to seize petitioner's car but also to search the car after it had been taken to the police station. The police had probable cause to believe that the car had been used in the commission of the murder and that it contained evidence of the crime. Under *Carroll* v. *United States,* 267 U. S. 132 (1925), and *Chambers* v. *Maroney,* *supra,* such belief was sufficient justification for the seizure and the search of petitioner's automobile.

The majority reasons that the *Chambers* and *Carroll* rationale, based on the mobility of automobiles, is inapplicable here because the petitioner's car could have been placed under guard and, thereby, rendered immobile. But this Court explicitly rejected such reasoning in *Chambers:* "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. . . .. The probable-cause factor still obtained at the station house and so did the mobility of the car . . . ." 399 U. S., at 52. This Court held there that the delayed search at the station house, as well as an immediate search at the time of seizure, was reasonable under the Fourth Amendment.

As a second argument for holding that the *Chambers* decision does not apply to this case, the majority reasons that the evidence could not have been altered or the car

moved because petitioner was in custody and his wife was accompanied by police, at least until the police towed the car to the station. But the majority's reasoning depends on two assumptions: first, that the police should, or even could, continue to keep petitioner's wife effectively under house arrest; and, second, that no one else had any motivation to alter or remove the car. I cannot accept the first assumption, nor do I believe that the police · acted unreasonably in refusing to accept . the second.[2]

## C

I believe the seizure of petitioner's automobile was valid under the well-established right of the police to seize evidence in plain view at the time and place of arrest. The majority concedes that the police were rightfully at petitioner's residence to make a valid arrest at

---

[2] The majority attempts to rely on *Preston* v. *United States,* 376 U. S. 364 (1964), to support its holding that the police could not search petitioner's automobile at the station house. But this case is not *Preston,* nor is it controlled by *Preston.* The police arrested Preston for vagrancy. No claim was made that the police had any authority to hold his car in connection with that charge. The fact that the police had custody of Preston's car was totally unrelated to the vagrancy charge for which they arrested him; so was their subsequent search of the car. Here the officers arrested petitioner for murder. They seized petitioner's car as evidence of the crime for which he was arrested. Their subsequent search of the car was directly related to the reason petitioner was arrested and the reason ·his. car had been seized and, therefore, was valid under this Court's decision in *Cooper* v. *California,* 386 U. S. 58 (1967).

My Brother WHITE points out that the police in the present case not only searched the car immediately upon taking it to the station house, but also searched it 11 months and 14 months after seizure! We held in *Cooper,* where the search occurred one week after seizure, that the Fourth Amendment is not violated by the examination or search of a car validly held by officers for use as evidence in a pending trial. In my view the police are entitled to search a car whether detained for a week or for a year where that car is being properly held as relevant evidence of the crime charged.

the time of the seizure. To use the majority's words, the "initial intrusion" which brought the police within plain view of the automobile was legitimate. The majority also concedes that the automobile was "plainly visible both from the street and from inside the house where Coolidge was actually arrested," *ante,* at 448, and that the automobile itself was evidence which the police had probable cause to seize. *Ante,* at 464. Indeed, the majority appears to concede that the seizure of petitioner's automobile was valid under the doctrine upholding seizures of evidence in plain view at the scene of arrest, at least as it stood before today. *Ante,* at 465–466, n. 24.

However, even after conceding that petitioner's automobile itself was evidence of the crime, that the police had probable cause to seize it as such, and that the automobile was in plain view at the time and place of arrest, the majority holds the seizure to be a violation of the Fourth Amendment because the discovery of the automobile was not "inadvertent." The majority confidently states: "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." But the prior holdings of this Court not only fail to support the majority's statement, they flatly contradict it. One need look no further than the cases cited in the majority opinion to discover the invalidity of that assertion.

In one of these cases, *Ker* v. *California,* 374 U. S. 23 (1963), the police observed the defendant's participation in an illegal marihuana transaction, then went to his apartment to arrest him. After entering the apartment, the police saw and seized a block of marihuana as they placed the defendant under arrest. This Court upheld that seizure on the ground that the police were justifiably

in the defendant's apartment to make a valid arrest, there was no search because the evidence was in plain view, and the seizure of such evidence was authorized when incident to a lawful arrest. The discovery of the marihuana there could hardly be described as "inadvertent." [3]

In *Marron* v. *United States*, 275 U. S. 192 (1927), also cited by the majority, the Court upheld the seizure of business records as being incident to a valid arrest for operating an illegal retail whiskey enterprise. The records were discovered in plain view. I cannot say that the seizure of business records from a place of business during the course of an arrest for operating an illegal business was "inadvertent." [4]

The majority confuses the historically justified right of the police to seize visible evidence of the crime in open view at the scene of arrest with the "plain view" excep-

---

[3] The facts in *Ker* undermine the majority's attempt to distinguish it from the instant case. The arresting officer there learned from other policemen that Ker had been observed meeting with a known marihuana supplier. The arresting officer had received information at various times over an eight-month period that Ker was selling marihuana from his apartment and that he was securing this marihuana from the known supplier. The arresting officer had a "mug" photograph of Ker at the time of the arrest and testified that for at least two months he had received information as to Ker's marihuana activities from a named informant who had previously given information leading to three other arrests and whose information was believed to be reliable. The arresting officer did not know whether Ker would be present at his apartment on the night of arrest. The officer had neither an arrest nor a search warrant. He entered Ker's apartment, placed Ker under arrest, and seized the block of marihuana in plain view in the adjoining room. This Court held that the seizure was reasonable and therefore valid under the Fourth Amendment.

[4] The majority correctly notes, *ante*, at 464, that this Court in *Warden* v. *Hayden*, 387 U. S. 294 (1967), flatly rejected the distinction for purposes of the Fourth Amendment between "mere evidence" and contraband, a distinction which the majority appears to me to reinstate at another point in its opinion, *ante*, at 471 and 472.

tion to the requirement of particular description in search warrants. The majority apparently reasons that unless the seizure made pursuant to authority conferred by a warrant is limited to the particularly described object of seizure, the warrant will become a general writ of assistance. Evidently, as a check on the requirement of particular description in search warrants, the majority announces a new rule that items not named in a warrant cannot be seized unless their discovery was unanticipated or "inadvertent." [5] The majority's concern is with the

---

[5] The cases cited by the majority simply do not support the majority's new rule. For instance, when the police in *Steele* v. *United States*, 267 U. S. 498 (1925), entered a warehouse under the authority of a search warrant issued on a showing of probable cause that the Prohibition Act was being violated and naming "cases of whiskey" as the objects of search, it can scarcely be said that their discovery and seizure of barrels of whiskey and bottles and bottling equipment in plain view were "inadvertent."

The majority states that the seizure in *Warden* v. *Hayden, supra,* was justified because the police "inadvertently" came across the evidence while in hot pursuit of a fleeing suspect. In that case the police answered the call of two witnesses who stated that an armed robber had just held up a business. The witnesses described the robber and the clothes he was wearing. They had followed the robber to a particular house. The police searched the house and seized (1) a shotgun and a pistol found in a toilet on the second floor; (2) ammunition for the pistol and a cap like the one worn by the robber, both found beneath the mattress in the defendant's bedroom; and (3) a jacket and trousers of the type the fleeing man was said to have worn, found in a washing machine in the basement. It is quite difficult for me to accept the majority's characterization of these discoveries as "inadvertent."

See also *United States* v. *Lee,* 274 U. S. 559 (1927), another case cited by the majority, where Coast Guard officers, with probable cause to believe that a boat was being used to violate the Prohibition Act, shined a searchlight across the deck and discovered illicit whiskey. The admission of testimony regarding that discovery was upheld by this Court against a Fourth Amendment challenge, although the discovery could hardly be termed "inadvertent."

scope of the intrusion authorized by a warrant. But the right to seize items properly subject to seizure because in open view at the time of arrest is quite independent of any power to search for such items pursuant to a warrant. The entry in the present case did not depend for its authority on a search warrant but was concededly authorized by probable cause to effect a valid arrest. The intrusion did not exceed that authority. The intrusion was limited in scope to the circumstances which justified the entry in the first place—the arrest of petitioner. There was no general search; indeed, there was no search at all. The automobile itself was evidence properly subject to seizure and was in open view at the time and place of arrest.[6]

Only rarely can it be said that evidence seized incident to an arrest is truly unexpected or inadvertent. Indeed, if the police officer had no expectation of discovering weapons, contraband, or other evidence, he would make no search. It appears to me that the rule adopted by the Court today, for all practical purposes, abolishes seizure incident to arrest. The majority rejects the test of reasonableness provided in the Fourth Amendment and substitutes a *per se* rule—if the police could have obtained a warrant and did not, the seizure, no matter how reasonable, is void. But the Fourth Amendment does not require that every search be made pursuant to a warrant. It prohibits only "unreasonable searches and seizures." The relevant test is not the reasonableness of the opportunity to procure a warrant, but the reasonableness of the seizure under all the circumstances. The

---

[6] Moreover, what a person knowingly exposes to the public is not a subject of Fourth Amendment protection. See *Lewis v. United States*, 385 U. S. 206, 210 (1966); *United States v. Lee*, 274 U. S. 559, 563 (1927); *Hester v. United States*, 265 U. S. 57 (1924).

test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts.

For all the reasons stated above, I believe the seizure and search of petitioner's car was reasonable and, therefore, authorized by the Fourth Amendment. The evidence so obtained violated neither the Fifth Amendment which does contain an exclusionary rule, nor the Fourth Amendment which does not. The jury of petitioner's peers, as conscious as we of the awesome gravity of their decision, heard that evidence and found the petitioner guilty of murder. I cannot in good conscience upset that verdict.

MR. JUSTICE BLACKMUN joins MR. JUSTICE BLACK in Parts II and III of this opinion and in that portion of Part I thereof which is to the effect that the Fourth Amendment supports no exclusionary rule.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, concurring and dissenting.

I would affirm the judgment. In my view, Coolidge's Pontiac was lawfully seized as evidence of the crime in plain sight and thereafter was lawfully searched under *Cooper* v. *California*, 386 U. S. 58 (1967). I am therefore in substantial disagreement with Parts II–C and II–D of the Court's opinion. Neither do I agree with Part II–B, and I can concur only in the result as to Part III.

I

The Fourth Amendment commands that the public shall be secure in their "persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." As to persons, the overwhelming weight of authority is that a police officer may make an arrest without a warrant when he has probable cause to believe the suspect

has committed a felony.[1]   The general rule also is that upon the lawful arrest of a person, he and the area under his immediate control may be searched and contraband or

---

[1] This was the common-law rule. 1 J. Stephen, A History of Criminal Law of England 193 (1883); 2 M. Hale, Historia Placitorum Coronae 72–104 (new ed. 1800). It is also the constitutional rule. In *Carroll* v. *United States,* 267 U. S. 132 (1925), the Court said that "[t]he usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony . . . ." *Id.,* at 156. There in September 1921, officers had probable cause to believe the two defendants were unlawfully transporting bootleg liquor, but they had neither effected an immediate arrest nor sought a warrant. Several months later they observed the two men driving on a public highway, stopped, and searched the car and arrested the men, and this Court sustained both the search and the arrest. So also in *Trupiano* v. *United States,* 334 U. S. 699 (1948), officers were amply forewarned of criminal activities and had time to seek a warrant but did not do so. Instead, some time later they entered on property where Trupiano had a still and found exactly what they expected to find—one of the defendants engaged in the distillation of bootleg liquor. His arrest without a warrant was sustained, the Court saying that "[t]he absence of a warrant of arrest, even though there was sufficient time to obtain one, [did] not destroy the validity of an arrest" in the circumstances of the case. *Id.,* at 705.

The judgment of Congress also is that federal law enforcement officers may reasonably make warrantless arrests upon probable cause. It has authorized such arrests by United States Marshals, agents of the Federal Bureau of Investigation and of the Secret Service, and narcotics law enforcement officers. See Act of June 15, 1935, § 2, 49 Stat. 378, as amended, 18 U. S. C. § 3053; Act of June 18, 1934, 48 Stat. 1008, as amended, 18 U. S. C. § 3052; Act of Sept. 29, 1965, 79 Stat. 890, as amended, 18 U. S. C. § 3056 (1964 ed., Supp. V); Act of July 18, 1956, Tit. I, § 104 (a), 70 Stat. 570, as amended, 26 U. S. C. § 7607 (2). And, in 1951, Congress expressly deleted from the authority to make warrantless arrests a pre-existing statutory restriction barring them in the absence of a likelihood that the person would escape before a warrant could be obtained. See Act of Jan. 10, 1951, § 1, 64 Stat. 1239; S. Rep. No. 2464, 81st Cong., 2d Sess., 2 (1950); H. R. Rep. No. 3228, 81st Cong., 2d Sess., 2 (1950);

evidence seized without a warrant. The right "to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime . . . has been uniformly maintained in many cases." *Weeks* v. *United States,* 232 U. S. 383, 392 (1914). Accord, *Chimel* v. *California,* 395 U. S. 752 (1969).

With respect to houses and other private places, the general rule is otherwise: a search is invalid unless made on probable cause and under the authority of a warrant specifying the area to be searched and the objects to be seized. There are various exceptions to the rule, however, permitting warrantless entries and limited searches, the most recurring being the arrest without a warrant.

The case before us concerns the protection offered by the Fourth Amendment to "effects" other than personal

---

*Chimel* v. *California,* 395 U. S. 752, 776–780 (1969) (dissenting opinion).

The majority now suggests that warrantless, probable-cause arrests may not be made in the home absent exigent circumstances. *Jones* v. *United States,* 357 U. S. 493 (1958), invalidated a forcible nighttime entry to effect a search without a warrant and suggested also that the particular circumstances of 'the entry would have posed a serious Fourth Amendment issue if the purpose of the entry had been to make an arrest. But, as a constitutional matter, the Court has never held or intimated that all probable-cause arrests without a warrant in the home must be justified by exigent circumstances other than the necessity for arresting a felon, or that, if the elapsed time between the accrual of probable cause and the making of the arrest proves sufficient to have obtained a warrant, the arrest is invalid. On the contrary, many cases in this Court have proceeded on the assumption that ordinarily warrantless arrests on probable cause may be effected even in the home. See *Sabbath* v. *United States,* 391 U. S. 585 (1968); *Miller* v. *United States,* 357 U. S. 301, 305–308 (1958); *United States* v. *Rabinowitz,* 339 U. S. 56, 60 (1950) (dictum); *Trupiano* v. *United States, supra; Johnson* v. *United States,* 333 U. S. 10, 15 (1948) (dictum). Of course, this is not to say that the time and method of entry could never pose serious constitutional questions under the Fourth Amendment.

papers or documents. It is clear that effects may not be seized without probable cause but the law as to when a warrant is required to validate their seizure is confused and confusing. Part of the difficulty derives from the fact that effects enjoy derivative protection when located in a house or other area within reach of the Fourth Amendment. Under existing doctrine, effects seized in warrantless, illegal searches of houses are fruits of a constitutional violation and may not be received in evidence. But is a warrant required to seize contraband or criminal evidence when it is found by officers at a place where they are legally entitled to be at the time? Before a person is deprived of his possession or right to possession of his effects, must a magistrate confirm that what the officer has legally seen (and would be permitted to testify about, if relevant and material) is actually contraband or criminal evidence?

The issue arises in different contexts. First, the effects may be found on public property. Suppose police are informed that important evidence has been secreted in a public park. A search is made and the evidence found. Although the evidence was hidden rather than abandoned, I had not thought a search warrant was required for officers to make a seizure, see *United States v. Lee,* 274 U. S. 559 (1927) (boat seized on public waters); [2] *Hester* v. *United States,* 265 U. S. 57 (1924) (liquor seized in open field); any more than a warrant is needed to seize an automobile which is itself evidence of crime and which is found on a public street or in a parking lot. See *Cooper* v. *California, supra.*

Second, the items may be found on the premises of a third party who gives consent for an official search

---

[2] *Lee* permitted the revenue officers who seized the boat to take and chemically analyze bootleg liquor found aboard it and then to testify as to the results of their analysis.

but who has no authority to consent to seizure of another person's effects. *Frazier* v. *Cupp,* 394 U. S. 731 (1969), would seem to settle the validity of the seizure without a warrant as long as the search itself involves no Fourth Amendment violation.

Third, the police may arrest a suspect in his home and in the course of a properly limited search discover evidence of crime. The line of cases from *Weeks* v. *United States, supra,* to *Harris* v. *United States,* 331 U. S. 145 (1947), had recognized the rule that upon arrest searches of the person and of adjacent areas were reasonable, and *Harris* had approved an incidental search of broad scope. In the next Term, however, *Trupiano* v. *United States,* 334 U. S. 699 (1948), departed from the *Harris* approach. In *Trupiano,* officers, with probable cause to arrest, entered property and arrested the defendant while he was operating an illegal still. The still was seized. Time and circumstance would have permitted the officers to secure both arrest and search warrants, but they had obtained neither. The Court did not disturb seizure of the person without warrant but invalidated seizure of the still since the officers could have had a warrant but did not. *United States* v. *Rabinowitz,* 339 U. S. 56 (1950), however, returned to the rule that the validity of searches incident to arrest does not depend on the practicability of securing a warrant. And, while *Chimel* v. *California, supra,* narrowed the permissible scope of incident searches to the person and the immediate area within reach of the defendant, it did not purport to re-establish the *Trupiano* rule that searches accompanying arrests are invalid if there is opportunity to get a warrant.

Finally, officers may be on a suspect's premises executing a search warrant and in the course of the authorized search discover evidence of crime not covered by the warrant. *Marron* v. *United States,* 275 U. S. 192

(1927), flatly held that legal presence under a warrant did not itself justify the seizure of such evidence. However, seizure of the same evidence was permitted because it was found in plain sight in the course of making an arrest and an accompanying search. It is at least odd to me to permit plain-sight seizures arising in connection with warrantless arrests, as the long line of cases ending with *Chimel* has done, or arising in the course of a hot-pursuit search for a felon, *Warden* v. *Hayden,* 387 U. S. 294 (1967); *Hester* v. *United States, supra;* and yet forbid the warrantless seizure of evidence in plain sight when officers enter a house under a search warrant that is perfectly valid but does not cover the items actually seized. I have my doubts that this aspect of *Marron* can survive later cases in this Court, particularly *Zap* v. *United States,* 328 U. S. 624 (1946), vacated on other grounds, 330 U. S. 800 (1947), where federal investigators seized a cancelled check evidencing a crime that had been observed during the course of an otherwise lawful search. See also *Stanley* v. *Georgia,* 394 U. S. 557, 569 (1969) (STEWART, J., concurring in result). Cf. *Chimel* v. *California, supra; Warden* v. *Hayden, supra; Frazier* v. *Cupp, supra.* Apparently the majority agrees, for it lumps plain-sight seizures in such circumstances along with other situations where seizures are made after a legal entry.

In all of these situations, it is apparent that seizure of evidence without a warrant is not itself an invasion either of personal privacy or of property rights beyond that already authorized by law. Only the possessory interest of a defendant in his effects is implicated. And in these various circumstances, at least where the discovery of evidence is "inadvertent," the Court would permit the seizure because, it is said, "the minor peril to Fourth Amendment protections" is overridden by the "major gain in effective law enforcement" inherent in

avoiding the "needless inconvenience" of procuring a warrant. *Ante,* at 467, 468. I take this to mean that both the possessory interest of the defendant and the importance of having a magistrate confirm that what the officer saw with his own eyes is in fact contraband or evidence of crime are not substantial constitutional considerations. Officers in these circumstances need neither guard nor ignore the evidence while a warrant is sought. Immediate seizure is justified and reasonable under the Fourth Amendment.

The Court would interpose in some or all of these situations, however, a condition that the discovery of the disputed evidence be "inadvertent." If it is "anticipated," that is if "the police know in advance the location of the evidence and intend to seize it," the seizure is invalid. *Id.,* at 470.

I have great difficulty with this approach. Let us suppose officers secure a warrant to search a house for a rifle. While staying well within the range of a rifle search, they discover two photographs of the murder victim, both in plain sight in the bedroom. Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated. The Court would permit the seizure of only one of the photographs. But in terms of the "minor" peril to Fourth Amendment values there is surely no difference between these two photographs: the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other. And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant. The Court, however, states that the State will suffer no constitutionally cognizable inconvenience from invalidating anticipated seizures since it had probable cause to search

for the items seized and could have included them in a warrant.

This seems a punitive and extravagant application of the exclusionary rule. If the police have probable cause to search for a photograph as well as a rifle and they proceed to seek a warrant, they could have no possible motive for deliberately including the rifle but omitting the photograph. Quite the contrary is true. Only oversight or careless mistake would explain the omission in the warrant application if the police were convinced they had probable cause to search for the photograph. Of course, they may misjudge the facts and not realize they have probable cause for the picture, or the magistrate may find against them and not issue a warrant for it. In either event the officers may validly seize the photograph for which they had no probable cause to search but the other photograph is excluded from evidence when the Court subsequently determines that the officers, after all, had probable cause to search for it.

More important, the inadvertence rule is unnecessary to further any Fourth Amendment ends and will accomplish nothing. Police with a warrant for a rifle may search only places where rifles might be and must terminate the search once the rifle is found; the inadvertence rule will in no way reduce the number of places into which they may lawfully look. So, too, the areas of permissible search incident to arrest are strictly circumscribed by *Chimel*. Excluding evidence seen from within those areas can hardly be effective to operate to prevent wider, unauthorized searches. If the police stray outside the scope of an authorized *Chimel* search they are already in violation of the Fourth Amendment, and evidence so seized will be excluded; adding a second reason for excluding evidence hardly seems worth the candle. Perhaps the Court is concerned that officers, having the

right to intrude upon private property to make arrests, will use that right as a pretext to obtain entry to search for objects in plain sight, cf. *Chimel* v. *California, supra,* at 767, but, if so, such a concern is unfounded. The reason is that under *Chimel* the police can enter only into those portions of the property into which entry is necessary to effect the arrest. Given the restrictions of *Chimel,* the police face a substantial risk that in effecting an arrest and a search incident thereto they will never enter into those portions of the property from which they can plainly see the objects for which they are searching and that, if they do not, those objects will be destroyed before they can return and conduct a search of the entire premises pursuant to a warrant. If the police in fact possess probable cause to believe that weapons, contraband, or evidence of crime is in plain view on the premises, it will be far safer to obtain a search warrant than to take a chance that in making an arrest they will come into plain view of the object they are seeking. It is only when they lack probable cause for a search—when, that is, discovery of objects in plain view from a lawful vantage point is inadvertent—that entry to make an arrest might, as a practical matter, assist the police in discovering an object for which they could not have obtained a warrant. But the majority in that circumstance would uphold their authority to seize what they see. I thus doubt that the Court's new rule will have any measurable effect on police conduct. It will merely attach undue consequences to what will most often be an unintended mistake or a misapprehension of some of this Court's probable-cause decisions, a failing which, I am afraid, we all have.

By invalidating otherwise valid, plain-sight seizures where officers have probable cause and presumably, although the Court does not say so, opportunity to secure a warrant, the Court seems to turn in the direction of

the *Trupiano* rule, rejected in *Rabinowitz* and not revived in *Chimel*. But it seems unsure of its own rule.

It is careful to note that Coolidge's car is not contraband, stolen, or in itself dangerous. Apparently, contraband, stolen, or dangerous materials may be seized when discovered in the course of an otherwise authorized search even if the discovery is fully anticipated and a warrant could have been obtained. The distinction the Court draws between contraband and mere evidence of crime is reminiscent of the confusing and unworkable approach that I thought *Warden* v. *Hayden, supra,* had firmly put aside.

Neither does the Court in so many words limit *Chimel;* on the contrary, it indicates that warrantless *Chimel*-type searches will not be disturbed, even if the police "anticipate that they will find specific evidence during the course of such a search." *Ante,* at 482. The Court also concedes that, when an arresting officer "comes within plain view of a piece of evidence, not concealed, although outside of the area under the immediate control of the arrestee, the officer may seize it, so long as the plain view was obtained in the course of an appropriately limited search of the arrestee." *Id.,* at 466 n. 24. Yet today's decision is a limitation on *Chimel,* for in the latter example, the Court would permit seizure only if the plain view was inadvertently obtained. If the police, that is, fully anticipate that, when they arrest a suspect as he is entering the front door of his home, they will find a credit card in his pocket and a picture in plain sight on the wall opposite the door, both of which will implicate him in a crime, they may under today's decision seize the credit card but not the picture. This is a distinction that I find to be without basis and that the Court makes no attempt to explain. I can therefore conclude only that *Chimel* and today's holding are squarely inconsistent and that the Court, unable to per-

ceive any reasoned distinction, has abandoned any attempt to find one.

The Court also fails to mention searches carried out with third-party consent. Assume for the moment that authorities are reliably informed that a suspect, subject to arrest, but not yet apprehended, has concealed specified evidence of his crime in the house of a friend. The friend freely consents to a search of his house and accompanies the officers in the process. The evidence is found precisely where the officers were told they would find it, and the officers proceed to seize it, aware, however, that the friend lacks authority from the suspect to confer possession on them. The suspect's interest in not having his possession forcibly interfered with in the absence of a warrant from a magistrate is identical to the interest of Coolidge, and one would accordingly expect the Court to deal with the question. *Frazier* v. *Cupp, supra,* indicates that a seizure in these circumstances would be lawful, and the Court today neither overrules nor distinguishes *Frazier;* in fact, Part III of the Court's opinion, which discusses the officers' receipt of Coolidge's clothing and weapons from Mrs. Coolidge, implicitly approves *Frazier.*

Neither does the Court indicate whether it would apply the inadvertence requirement to searches made in public places, although one might infer from its approval of *United States* v. *Lee, supra,* which held admissible a chemical analysis of bootleg liquor observed by revenue officers in plain sight, that it would not.

Aware of these inconsistencies, the Court admits that "it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony." *Ante,* at 483. But it concludes that logical consistency cannot be attained in constitutional law and ultimately comes to rest upon its belief "that the result reached in this case is correct. . . ." *Id.,* at 484. It

may be that constitutional law cannot be fully coherent and that constitutional principles ought not always be spun out to their logical limits, but this does not mean that we should cease to strive for clarity and consistency of analysis. Here the Court has a ready opportunity, one way or another, to bring clarity and certainty to a body of law that lower courts and law enforcement officials often find confusing. Instead, without apparent reason, it only increases their confusion by clinging to distinctions that are both unexplained and inexplicable.

## II

In the case before us, the officers had probable cause both to arrest Coolidge and to seize his car. In order to effect his arrest, they went to his home—perhaps the most obvious place in which to look for him. They also may have hoped to find his car at home and, in fact, when they arrived on the property to make the arrest, they did find the 1951 Pontiac there. Thus, even assuming that the Fourth Amendment protects against warrantless seizures outside the house, but see *Hester* v. *United States, supra,* at 59, the fact remains that the officers had legally entered Coolidge's property to effect an arrest and that they seized the car only after they observed it in plain view before them. The Court, however, would invalidate this seizure on the premise that officers should not be permitted to seize effects in plain sight when they have anticipated they will see them.

Even accepting this premise of the Court, seizure of the car was not invalid. The majority makes an assumption that, when the police went to Coolidge's house to arrest him, they anticipated that they would also find the 1951 Pontiac there. In my own reading of the record, however, I have found no evidence to support this assumption. For all the record shows, the police, although they may have hoped to find the Pontiac at

Coolidge's home, did not know its exact location when they went to make the arrest, and their observation of it in Coolidge's driveway was truly inadvertent. Of course, they did have probable cause to seize the car, and, if they had had a valid warrant as well, they would have been justified in looking for it in Coolidge's driveway—a likely place for it to be. But if the fact of probable cause bars this seizure, it would also bar seizures not only of cars found at a house, but also of cars parked in a parking lot, hidden in some secluded spot, or delivered to the police by a third party at the police station. This would simply be a rule that the existence of probable cause bars all warrantless seizures.

It is evident on the facts of this case that Coolidge's Pontiac was subject to seizure if proper procedures were employed. It is also apparent that the Pontiac was in plain view of the officers who had legally entered Coolidge's property to effect his arrest. I am satisfied that it was properly seized whether or not the officers expected that it would be found where it was. And, since the Pontiac was legally seized as evidence of the crime for which Coolidge was arrested, *Cooper v. California, supra,* authorizes its warrantless search while in lawful custody of the police. "It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it. It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' . . . Under the circumstances of this case, we cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence . . . ." *Cooper v. California, supra,* at 61–62.

## III

Given the foregoing views, it is perhaps unnecessary to deal with the other grounds offered to sustain the search of Coolidge's car. Nonetheless, it may be helpful to explain my reasons for relying on the plain-sight rule rather than on *Chambers* v. *Maroney*, 399 U. S. 42 (1970), to validate this search.

*Chambers* upheld the seizure and subsequent search of automobiles at the station house rather than requiring the police to search cars immediately at the places where they are found. But *Chambers* did not authorize indefinite detention of automobiles so seized; it contemplated some expedition in completing the searches so that automobiles could be released and returned to their owners. In the present case, however, Coolidge's Pontiac was not released quickly but was retained in police custody for more than a year and was searched not only immediately after seizure but also on two other occasions: one of them 11 months and the other 14 months after seizure. Since fruits of the later searches as well as the earlier one were apparently introduced in evidence, I cannot look to *Chambers* and would invalidate the later searches but for the fact that the police had a right to seize and detain the car not because it was a car, but because it was itself evidence of crime. It is only because of the long detention of the car that I find *Chambers* inapplicable, however, and I disagree strongly with the majority's reasoning for refusing to apply it.

As recounted earlier, arrest and search of the person on probable cause but without a warrant is the prevailing constitutional and legislative rule, without regard to whether on the particular facts there was opportunity to secure a warrant. Apparently, exigent circumstances are so often present in arrest situations that it has been

deemed improvident to litigate the issue in every case.

In similar fashion, "practically since the beginning of the Government," Congress and the Court have recognized "a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll* v. *United States*, 267 U. S. 132, 153 (1925). As in the case of an arrest and accompanying search of a person, searches of vehicles on probable cause but without a warrant have been deemed reasonable within the meaning of the Fourth Amendment without requiring proof of exigent circumstances beyond the fact that a movable vehicle is involved. The rule has been consistently recognized, see *Cooper* v. *California, supra; Brinegar* v. *United States*, 338 U. S. 160 (1949); *Harris* v. *United States, supra,* at 168 (dissenting opinion); *Davis* v. *United States*, 328 U. S. 582, 609 (1946) (dissenting opinion); *Scher* v. *United States*, 305 U. S. 251 (1938); *Husty* v. *United States*, 282 U. S. 694 (1931); *United States* v. *Lee, supra;* and was reaffirmed less than a year ago in *Chambers* v. *Maroney, supra,* where a vehicle was stopped on the highway but was searched at the police station, there being probable cause but no warrant.

The majority now approves warrantless searches of vehicles in motion when seized. On the other hand, warrantless, probable-cause searches of parked but movable vehicles in some situations would be valid only upon proof of exigent circumstances justifying the search. Although I am not sure, it would seem that, when police discover a parked car that they have probable cause to search, they may not immediately search but must seek

a warrant. But if before the warrant arrives, the car is put in motion by its owner or others, it may be stopped and searched on the spot or elsewhere. In the case before us, Coolidge's car, parked at his house, could not be searched without a valid warrant, although if Coolidge had been arrested as he drove away from his home, immediate seizure and subsequent search of the car would have been reasonable under the Fourth Amendment.

I find nothing in the language or the underlying rationale of the line of cases from *Carroll* to *Chambers* limiting vehicle searches as the Court now limits them in situations such as the one before us. Although each of those cases may, as the Court argues, have involved vehicles or vessels in motion prior to their being stopped and searched, each of them approved the search of a vehicle that was no longer moving and, with the occupants in custody, no more likely to move than the unattended but movable vehicle parked on the street or in the driveway of a person's house. In both situations the probability of movement at the instance of family or friends is equally real, and hence the result should be the same whether the car is at rest or in motion when it is discovered.

In *Husty* v. *United States, supra,* the police had learned from a reliable informant that Husty had two loads of liquor in automobiles of particular make and description parked at described locations. The officers found one of the cars parked and unattended at the indicated spot. Later, as officers watched, Husty and others entered and started to drive away. The car was stopped after having moved no more than a foot or two; immediate search of the car produced contraband. Husty was then arrested. The Court, in a unanimous opinion, sustained denial of a motion to suppress the fruits of the search, saying that "[t]he Fourth Amendment does not prohibit the search, without warrant, of an automobile, for liquor illegally

transported or possessed, if the search is upon probable cause . . . ." *Id.*, at 700. Further, "[t]he search was not unreasonable because, as petitioners argue, sufficient time elapsed between the receipt by the officer of the information and the search of the car to have enabled him to procure a search warrant. He could not know when Husty would come to the car or how soon it would be removed. In such circumstances we do not think the officers should be required to speculate upon the chances of successfully carrying out the search, after the delay and withdrawal from the scene of one or more officers which would have been necessary to procure a warrant. The search was, therefore, on probable cause, and not unreasonable . . . ." *Id.*, at 701.

The Court apparently cites *Husty* with approval as involving a car in motion on the highway. But it was obviously irrelevant to the Court that the officers could have obtained a warrant before Husty attempted to drive the car away. Equally immaterial was the fact that the car had moved one or two feet at the time it was stopped. The search would have been approved even if it had occurred before Husty's arrival or after his arrival but before he had put the car in motion. The Court's attempt to distinguish *Husty* on the basis of the car's negligible movement prior to its being stopped is without force.

The Court states flatly, however, that this case is not ruled by the *Carroll-Chambers* line of cases but by *Dyke* v. *Taylor Implement Mfg. Co.,* 391 U. S. 216 (1968). There the car was properly stopped and the occupants arrested for reckless driving, but the subsequent search at the station house could not be justified as incident to the arrest. See *Preston* v. *United States,* 376 U. S. 364 (1964). Nor could the car itself be seized and later searched, as it was, absent probable cause to believe it contained evidence of crime. In *Dyke,* it was pointed out

that probable cause did not exist at the time of the search, and we expressly rested our holding on this fact, noting that "[s]ince the search was not shown to have been based upon sufficient cause," it was not necessary to reach other grounds urged for invalidating it. 391 U. S., at 222. Given probable cause, however, we would have upheld the search in *Dyke*.

For Fourth Amendment purposes, the difference between a moving and movable vehicle is tenuous at best. It is a metaphysical distinction without roots in the commonsense standard of reasonableness governing search and seizure cases. Distinguishing the case before us from the *Carroll-Chambers* line of cases further enmeshes Fourth Amendment law in litigation breeding refinements having little relation to reality. I suggest that in the interest of coherence and credibility we either overrule our prior cases and treat automobiles precisely as we do houses or apply those cases to readily movable as well as moving vehicles and thus treat searches of automobiles as we do the arrest of a person. By either course we might bring some modicum of certainty to Fourth Amendment law and give the law enforcement officers some slight guidance in how they are to conduct themselves.

I accordingly dissent from Parts II–B, II–C, and II–D of the Court's opinion. I concur, however, in the result reached in Part III of the opinion. I would therefore affirm the judgment of the New Hampshire Supreme Court.