OPINION
{¶ 1} Defendant-appellant Vincent Williams appeals from his conviction and sentence for possession of Cocaine and Possession of Criminal Tools, following a no-contest plea. Williams contends that the trial court erred by overruling his motion to suppress evidence obtained as the result of an allegedly unlawful search and seizure. We conclude that the evidence in the record supports a conclusion that a police officer, while making a lawful stop, had sufficient grounds to perform a pat-down search for weapons, and was still legitimately attempting to rule out the possibility that a rolled up newspaper lodged in Williams's jacket sleeve contained a weapon, when a baggie in the rolled up newspaper, containing cocaine, came into the officer's plain view. Accordingly, we conclude that the trial court did not err in overruling Williams's motion to suppress, and the judgment of the trial court is Affirmed.
 I {¶ 2} Dayton police officer Eric Henderson was on patrol in Dayton at about 7:30 p.m. on Friday, January 17, 2003, when he noticed a car being driven by Williams traveling southbound on James H. McGee Blvd. His partner, Shawn Emerson, noticed that Williams's car did not have a license plate light, and the license plate number could not be determined. Henderson followed Williams, intending to cite him for the failure to have a license plate light, and the failure to have a legible license plate. Williams got on the entrance ramp to U.S. 35, eastbound. Henderson followed. Henderson did not want to attempt to stop Williams until they had both got on Route 35, but proceeded to turn on his overhead lights as soon as they had got on Route 35.
 {¶ 3} Williams pulled off on the right shoulder of Route 35, in response to Henderson's having turned on his overhead lights. Nothing remarkable occurred until Henderson and Emerson started to get out of their cruiser, when the driver's side door of the vehicle driven by Williams "flew open," and Williams got out and took off running across three lanes of traffic. Williams jumped over the concrete divider, with Henderson and Emerson in pursuit, and ran across the three lanes of westbound traffic. Henderson could not recall if there was any other traffic on Route 35 that evening.
 {¶ 4} Henderson ordered Williams to stop when he caught up with Williams at the divider, but Williams kept on going, crossed the westbound lanes, and climbed over a fence. After crossing a street, Williams stopped, looked back, and began reaching in his jacket. By this time, Henderson understandably suspected that this might not be a routine traffic stop, and was concerned that Williams might be reaching for a weapon. Henderson drew his weapon, and ordered Williams down to the ground, but Williams took off running again. During the pursuit, Williams pulled his jacket off, or nearly off.
 {¶ 5} Eventually, Henderson caught Williams, and took him to the ground. When Emerson arrived, Williams left him in charge of Williams, and "backtracked," looking to see if he could find anything that Williams might have discarded during the chase. He found nothing of interest.
 {¶ 6} With Emerson's help, Henderson had managed to handcuff Williams, behind his back. By this time, Williams's jacket was no longer being worn, but was sandwiched between Williams's handcuffed hands and his back. Emerson testified concerning what happened next, as follows:
 {¶ 7} "A. Officer Henderson goes ahead and gets up and told me he was going to backtrack to see if he had thrown anything down. I went ahead and had the suspect stand up, and as we did so, a large sum of money came out of his left — that left coat pocket that was still hanging on him.
 {¶ 8} "Q. Okay. So the coat was still hanging on him as you helped him up to his feet?
 {¶ 9} "A. Yes, it is trapped there between his hands and his back.
 {¶ 10} "Q. All right. And you said a large sum of money came out of which side of the coat?
 {¶ 11} "A. It was his left coat pocket.
 {¶ 12} "Q. And what kind of — what do you mean by large sum? How much was it?
 {¶ 13} "A. Well, I could just tell it was a large wad. I mean, just a large wad of cash.
 {¶ 14} "Q. Okay. And would that concern you at all or —
 {¶ 15} "MR. SKELTON: Objection.
 {¶ 16} "Q. — raise your suspicion in any way?
 {¶ 17} "A. Yes.
 {¶ 18} "THE COURT: Overruled.
 {¶ 19} "Q. And why would that raise your suspicion?
 {¶ 20} "A. Well, in my experience, whenever we've been involved with the drugs — where we made drug arrests, many times they will have large wads of cash on them, not carrying it in their wallet or anything, just large wads of cash.
 {¶ 21} "Q. Okay. And just as a side note, did you ever have a chance to count that money?
 {¶ 22} "A. It was later counted.
 {¶ 23} "Q. And how much was it that we were talking about?
 {¶ 24} "A. Well, that was just a portion of it that fell out. The rest of it Officer Harshman recovered from that left pocket.
 {¶ 25} "Q. Okay.
 {¶ 26} "A. And it was over three thousand dollars.
 {¶ 27} "Q. But the portion — you mean total?
 {¶ 28} "A. Yes, the total amount.
 {¶ 29} ". . .
 {¶ 30} "Q. Now, you see the money come out of that pocket. What do you do with the jacket at that — well, what do you do next? Let's put it that way.
 {¶ 31} "A. Well, I was going to pat him down to make sure he didn't have any weapons on him. In order to do so I needed to remove that coat because it was in my way because it was there around his hands and everything. As I pulled the coat away, I felt a large bulge in one of the sleeves, and also as I grabbed that bulge, you can see newspaper hanging out of the sleeve, end of the sleeve, the cuff end of the sleeve.
 {¶ 32} "Q. Let me ask you this based on your experience as a Dayton Police Officer, is that a common place to find newspaper, in a sleeve in a jacket?
 {¶ 33} "A. No.
 {¶ 34} "Q. Is that the first time you have seen it there?
 {¶ 35} "A. Yes.
 {¶ 36} "Q. Okay. And you noticed a large bulge. Can you define or explain to us, what exactly was it you felt?
 {¶ 37} "A. At that point I really wasn't sure what it was. It was — I mean, it was so large it would not fall out of the sleeve.
 {¶ 38} "Q. All right.
 {¶ 39} "A. It was trapped in the sleeve it was so large, and I could just feel that there was something inside that newspaper, but the newspaper obscured me from being able to see exactly what it was.
 {¶ 40} "Q. Why —
 {¶ 41} "A. I mean, obscured my feel, I guess.
 {¶ 42} "Q. Okay. Why did the newspaper obscure your feel?
 {¶ 43} "A. Well, because it was — there was so much newspaper and later found to be plastic as well.
 {¶ 44} "Q. And based on everything that you had observed so far, the fact that the defendant ran, the fact that he had the money falling out of his pocket, did you have any suspicions at that point as to what possibly could be there?
 {¶ 45} "A. Yes.
 {¶ 46} "Q. And what was that?
 {¶ 47} ". . .
 {¶ 48} "THE WITNESS: What I had mentioned with the money being involved in drugs, when I saw that large sum of money fall out and I felt a large wad of something in his sleeve, I suspected there was probably drugs inside of there.
 {¶ 49} "Q. Okay. Were you concerned about any weapons being inside there also?
 {¶ 50} "A. Yes. I wanted to go ahead and check it to make sure, because, like I said, it was wrapped up so well that, I mean, there could have been a knife in there, there could have been a gun, so I didn't want to go ahead and remove it before — we put the defendant's property with him, make sure there's no weapon inside of there.
 {¶ 51} "Q. Okay. And you have already indicated he had at least one other pocket to put any other kind of personal items inside, correct?
 {¶ 52} "A. Yes.
 {¶ 53} "Q. Were there more than one pocket?
 {¶ 54} "A. Yeah, there was a left and right coat pocket.
 {¶ 55} "Q. All right. And the newspaper was thick enough that you were not able to even tell if it was a gun inside of there?
 {¶ 56} "MR. SKELTON: Objection, Judge. Now, this is getting to the heart of the matter and she's leading the witness.
 {¶ 57} "MS. HIETT: He already testified to that. I just wanted to make — clarify it.
 {¶ 58} "THE COURT: He testified to it once, but it was very leading.
 {¶ 59} "Q. All right. I'll rephrase. Based on the bulk of newspaper that was around this item, were you able to rule out it being a gun?
 {¶ 60} "A. No.
 {¶ 61} "Q. All right. So based on the feel of that, what did you do next?
 {¶ 62} "A. Well, I went ahead and I laid the coat on top of the trunk and patted him down first, and once I patted him down for weapons and made sure there was no weapons on him, I placed him in the car and then went to make sure — see what was in the coat.
 {¶ 63} "Q. Okay. And was that coat in your sight the whole time?
 {¶ 64} "A. Yes. Yeah, it was laying right next to me.
 {¶ 65} "Q. All right. And for the record, did you find any weapons on the defendant —
 {¶ 66} "A. No.
 {¶ 67} "Q. — himself?
 {¶ 68} "A. No.
 {¶ 69} "Q. Okay. All right. When you grabbed the coat then off of the cruiser, what do you do with it?
 {¶ 70} "A. I go ahead and I remove that pack — the newspaper to see what it was, and as I'm removing it, part of the end had come loose, I guess from the run, you could see the white substance which I immediately recognized as cocaine.
 {¶ 71} "Q. All right. And you have seen cocaine before?
 {¶ 72} "A. Yes.
 {¶ 73} "Q. On numerous occasions?
 {¶ 74} "A. Yes."
 {¶ 75} Williams was arrested and charged by indictment with Possession of Cocaine and Possession of Criminal Tools. He moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, his motion to suppress was overruled. Thereafter, Williams pled no contest, was found guilty, and was sentenced accordingly. From his conviction and sentence, Williams appeals.
 II {¶ 76} Williams's sole assignment of error is as follows:
 {¶ 77} "The trial judge improperly denied defendant's motion to suppress."
 {¶ 78} Williams does not challenge the propriety of the stop, but contends that the cocaine found in his jacket sleeve was the result of an unlawful search. He contends that the police officers were searching for drugs, but that they were without probable cause to believe that drugs were in the sleeve.
 {¶ 79} Parenthetically, the State argues, among other things, that the search of Williams's jacket sleeve should be upheld as a search of Williams's person incident to arrest. The State contends that the officers had probable cause to arrest Williams for obstructing official business, and for failure to obey an order or signal from a police officer, and this entitled them to conduct a full search of Williams's person as a search incident to arrest. The first problem we have with this argument is that it was not made in the trial court. The second problem is that we are reluctant to uphold a search on the basis that it was incident to an arrest that was never made. Although the police officers might have arrested Williams for these offenses, there is nothing in the record to indicate that they ever did so.
 {¶ 80} However, we conclude that the cocaine was not obtained as the result of an unlawful search and seizure. Although Officer Emerson acknowledged that he had a suspicion that Williams might have drugs upon his person, he also indicated that he believed that Williams might be armed. Based on everything that transpired following the stop, we conclude that the officers' belief that Williams might be armed was reasonable. Emerson testified that he had not yet ruled out the presence of a weapon, either a knife or a gun, contained in the rolled up newspaper in Williams's jacket sleeve, when the baggie containing the cocaine came into his plain view. Emerson testified that it was immediately apparent to him that the substance in the baggie was cocaine, and the trial court evidently credited this testimony.
 {¶ 81} When an officer has a justified belief that a suspect is armed, the officer may conduct a limited pat-down search for weapons. Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868. When an officer is conducting a lawful pat-down search for weapons, and discovers an object on the suspect's person that the officer, through his sense of touch, reasonably believes could be a weapon, the officer may continue the search until either a weapon is found, or the officer can rule out the possibility of a weapon. State v. Evans (1993), 67 Ohio St.3d 405. According to the testimony of officer Emerson, which the trial court credited, he was still attempting to rule out the possibility of a weapon being in the rolled up newspaper when the baggie containing cocaine came into his plain view. Once the cocaine came into Emerson's plain view, he was permitted to seize it. Coolidge v.New Hampshire (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038.
 {¶ 82} Williams's sole assignment of error is overruled.
 III {¶ 83} Williams's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
Brogan and Grady, JJ., concur.